TRUMAN SAMPSON, APPELLEE, V. LADIES OF THE MACCABEES OF THE WORLD, APPELLANT.

FILED JUNE 26, 1911.   No. 16,483.

Insurance: APPEAL: CONFLICTING EVIDENCE. The action is upon a benefit certificate of membership insuring the life of the member in the sum of $1,000. There was a jury trial resulting in a verdict in favor of the beneficiary. The defenses presented were fraudulent representations in the application for membership, that the member committed suicide, which rendered the policy void, and that she died under the influence of a narcotic self-administered, which under the by-laws rendered the policy of no effect. The questions of fact were fairly submitted to the jury upon testimony which in effect was conflicting. *Held*, upon a review of the evidence, that the verdict could not be molested nor the judgment thereon be set aside.

APPEAL from the district court for Lancaster county: LINCOLN FROST, JUDGE. *Affirmed.*

*E. C. Strode, M. L. Learned* and *D. J. Flaherty*, for appellant.

*George W. Berge, contra.*

44

Reese, C. J.

This is an action by the beneficiary named in a certificate of membership issued by defendant upon the life of Pearle Sampson for $1,000, and in favor of plaintiff. The petition is in the usual form. The answer admits the corporate capacity of defendant as alleged in the petition; the issuance of the certificate of membership in plaintiff's favor in the sum of $1,000 upon the life of the assured; that the assured died at the time alleged; and that all dues and assessments had been paid in full at the time of the death of the member. It is alleged that decedent committed suicide by the use of poison administered by herself with the intent to destroy her life, and that by the terms of the by-laws, which are set out in the answer, and which were known and accepted by decedent, it is provided that "no benefit shall be paid on account of the death of a member who shall die by her own hand, while sane or insane," or who dies or becomes disabled while under the influence "of drugs or narcotics self-administered, whether with suicidal intent or not." It is also alleged that in the questions propounded to her by the medical examiner she was asked if she had "received treatment in a hospital, sanitarium, retreat, or any public or private institution for the treatment of physical or mental diseases," and that she answered "No," when in fact she had been confined in the Nebraska Hospital for the Insane at Lincoln in the year 1905, and upon the strength of this representation, which was believed and relied upon by defendant, she was admitted to membership in defendant, when, had she stated the truth, she would not have been so accepted; that the certificate was obtained by fraud; that by reason of the above facts she forfeited and waived all right to the payment of the benefit certificate. All averments of the petition not admitted are denied.

The reply is quite lengthy, consisting of specific denials of the averments of the answer and of the binding force of defendant's by-laws, or that they were a part of the

insurance contract. The allegations of false statements made in answer to questions by the medical examiner are denied, and it is alleged that the medical examination papers were prepared by defendant and its agent, were never given to the decedent to read, the answers being prepared by defendant's agent as she saw fit, and that decedent did answer all the questions truthfully and honestly, but the answers written by defendant's agent consisted of her own interpretation of the answers made by decedent and of which decedent had no knowledge; that the answers are not those of the applicant, but of defendant's agent; that the assured was prevented from knowing the contents of the paper which she signed, and a fraud was practiced upon her by which defendant is estopped to claim or assert that she did not answer the questions truthfully. It is denied that she was at any time insane or that she was confined in the hospital for the insane at Lincoln for the treatment of any disease, either mental or physical, but it is alleged that she was an orphan, destitute, and was in said hospital for rest only, and for a brief period, for want of another suitable place, and of which she advised defendant's agent and examiner at the time the examination was made. This is also presented as an estoppel against defendant.

A jury trial was had. At the close of the evidence the parties each moved for a directed verdict in their favor. Both motions were overruled, and the cause was submitted to the jury, the result being a verdict in favor of plaintiff for the amount of the policy and interest, upon which judgment in favor of plaintiff was rendered. Defendant appeals.

1. There is no question of error committed by the district court, either during the trial or by instructions; the whole contention of defendant being that the verdict and judgment is not supported by the evidence and is against the same. This contention involves three questions submitted to the jury: One was whether the decedent had "ever had a surgical operation performed, or received treatment in

a hospital, sanitarium, retreat, or any public or private institution for the treatment of physical or mental diseases?" In the investigation of this question, it was claimed by defendant that decedent had been insane and was confined in the hospital for the insane and had been treated therefor. In support of this contention, it was shown that she had been charged with being insane, had been examined by the board of insanity of Cass county and found so to be, and had been committed to the hospital as an insane patient. On the other hand, it is contended that she never was insane, but that, by reason of a serious and depressing disappointment, she had become temporarily hysterical, and in that condition was sent to the hospital, where her excitement passed off in a very few days without special treatment, and, by the rest which the hospital afforded, her nervous excitement disappeared and her condition was normal. Upon this subject there was a sharp conflict in the evidence. The records for the hospital for the insane are contained in the bill of exceptions. By them the following facts appear: She was admitted to the hospital September 12, 1905. "Diagnosis—acute mania. Remarks: Received in ward 4. Was noisy and resistive. Given two teaspoonfuls of bromo-chloral at bedtime. September 13: Fell from her chair this morning, but apparently was hysterical only. Has been very much afraid and starts and gets out of reach if any one attempts to touch her. Is not rational, but calls for 'Mama' and 'Guy'. * * * September 15: Has been quiet and rational and was transferred to ward 3. Wants some work to do. September 20: Remains quiet, rational and self-controlled. Is working in the sewing room. September 25: Transferred to ward 2. Quiet. Helps in sewing room. Cheerful. October 14: This morning patient, who has remained well mentally, complained of being cold and was found to have some fever. Gave a history of epistaxis a few days earlier. That her bowels had not moved for four days although she had taken salts. Tenderness in right iliac region. Transferred to ward 5

and given calomel—3 grains. October 17: Diagnosis made of appendicitis. Widal test negative. October 22: It has been decided not to operate unless constitutional symptoms increase. October 31: Temperature normal. Pain and tenderness gone. December 30: Well and strong. Helps in laundry. 1906, February 15: Continues well. Is cheerful and apparently well mentally. April 16: Lost a pair of scissors a few days ago and has been kept upon ward in consequence. Health and mental condition good. April 24: Paroled. August 1, 1906: Discharged. Recovered."

Taken for what it is worth, this shows, probably substantially correctly, the history of the patient's condition during the whole time she was in the hospital. If the record be a true one, it is shown, as claimed by plaintiff, that her nervous and excited condition disappeared between the 12th and 15th of September, probably in three days' time, and there are no other indications of mental aberration during the whole of her stay in the hospital, unless the loss of the scissors may be so accounted for. We presume that that fact could hardly be maintained. She seems to have suffered at one time from the effects of constipation and something of an attack of bleeding at the nose. Otherwise her health was good. Taken in connection with the other evidence that her only ailment was hysteria and temporary nervous excitement, we are not prepared to say that the verdict finding the answer to the question was not so far unsupported as to be said to be untrue. So far as is shown, her recovery from the nervous tension would have resulted as quickly had she remained at home as in the hospital. Having no parents and no home but that of her uncle, she seems to have been content to remain where she was. Presumptions are in favor of sanity.

2. As to the process of examination for admission to the order, not much can be said in favor of its fairness. The attention of Miss Sampson was not specifically called to the questions, many of which were in quite fine print,

and, as the examiner testified, she herself wrote down "the sum and substance" of the answers, the examiner thus writing her own conclusions by "Yes" or "No." The examination is shown to have been perfunctory, the applicant not having had the opportunity to read over the questions, answers, statements and "warranties" which would have taken considerable of time. The law does not presume fraud in the examination, and, as the alleged insanity was considered by the jury, they must have found that neither the insanity nor the fraudulent representations were proved.

3. The next contention is that Miss Sampson committed suicide, and therefore the policy was forfeited. The sections of the by-laws bearing upon this subject we have quoted above. Did Miss Sampson die by her own hand? We think the evidence quite clearly establishes the fact that in a sense she did, but whether the result proved to be as intended by her may have been a matter not free from serious doubts in the minds of the jury. It cannot be that the section of the by-laws under consideration should be held to mean exactly and fully what the language expresses. The section bears the head-note "Suicide." Suicide in law is the act of taking one's own life voluntarily and intentionally—self-murder. Webster's New International Dictionary. This must be accepted as the sense in which the language of the by-law is used. If Miss Sampson took one tablet of hyoscine (a common and reasonable dose, and which, as testified, can usually be taken safely and without danger) without any intention of injury to herself, and the results turned out to be unexpectedly disastrous, we do not think the cause of her death could furnish a defense to a suit on the policy. It was shown by the evidence, and it is within common knowledge, that the action of remedies which are counted innocent, and are commonly used, may produce different effects upon persons differing in temperament and physical condition. The only evidence aside from symptoms that she took hyoscine at all is furnished

by her statement that she had taken one tablet of the medicine, which, as we have said, was a common, ordinary dose for the relief of nervousness, and to produce sleep. She had been employed as an undergraduate nurse in one of the principal sanitariums in Lincoln, and was familiar with the use of the drug and its effect upon the human system. She had some medicines with her and a box containing instruments. She is spoken of in the evidence as a nurse, and therefore the possession of the medicines in use by physicians and nurses is not of itself convincing evidence of a purpose to use them improperly. She was in a high state of nervous excitement resulting from a distressing disappointment, and for two or three days had been almost constantly weeping and unable to sleep, and was suffering from a headache. In the afternoon of the day before the night upon which she died, she had instructed the family with whom she was sojourning not to awaken her for dinner should she be asleep when that meal was ready to be served. When the meal was prepared, a messenger went to her room to call her if awake, but, finding her asleep, she was not molested. Later she was found to be awake, when she declared she was feeling well, her headache had left her, and she was comfortable and cheerful. This was in the early part of the night. She stated that she had taken a tablet of the hyoscine, and requested that the vial containing the remaining tablets be removed. Thereafter she became flighty, indulged in singing a song, would fall asleep, apparently, for a few minutes, and upon waking would seem somewhat delirious. Her symptoms grew alarming, and a physician was called in, who found her beyond aid, and about one hour after midnight she died. During the afternoon of the day before, she wrote a letter to her former fiance referring to the shock and sorrow she felt from being turned down, as she expressed it, referring to some articles of more or less value which she gave him, and in rather unmistakable terms indicated an intention to end her life. The lady with whom she was staying was

in the room occupied by her during the afternoon, but, on being called down to answer the telephone in a lower room, left her, but, on returning to the upper room, found Miss Sampson standing at the head of the stairs, with the letter and a small box of jewelry, etc., in her hand, prepared to go downtown. Upon a promise that both could go later on, she returned, tore up the letter, and remained in her room until her death as above stated. No post-mortem examination was made. The physician who attended her at the time of her death testified that in his opinion she died from hyoscine poisoning, which was probably correct, but not of itself conclusive of the theory of suicide., Without a further discussion of the evidence, we may say it is the opinion of some of the members of the court that Miss Sampson was never insane, and that she did not commit suicide; that is, intentionally take her own life. It is the opinion of others, and in which the writer coincides, that, had the question of suicide been submitted to them in the first instance as the triers of fact, they would have believed from the evidence that she did intentionally take her own life, but that there is sufficient evidence to the contrary to justify the submission of the question to the jury, and, the burden of proof being upon the defendant to establish the defense, the finding of the jury cannot be set aside. As the death was not by violence, as by shooting, cutting, hanging, or the like, many of the indications of self-murder are wanting. The jurors heard the evidence, saw the witnesses, and no doubt arrived at a conscientious verdict.

The by-laws of defendant provide that no benefit shall be paid on account of the death of a member "who dies * * * under the influence of drugs or narcotics self-administered, whether with suicidal intent or not." It is insisted that hyoscine is a narcotic (which is true), and that Miss Sampson died "under the influence" of the medicine "self-administered" (which is perhaps also true), and therefore plaintiff cannot recover. This contention is based on the strict wording of the by-law. In

the interest of our common humanity, the writer hereof, for himself alone, refuses to give his assent to the construction of this section as contended for by defendant, and, did he do so, he would not hesitate to say that such a provision would be against public policy and void.  We are persuaded that no one could be found who would contend that were a person suffering the excruciating agonies which often precede death from accident, as by burning and such like, and should "self-administer" a narcotic or opiate without "suicidal intent" in order to obtain relief, and while under the solacing influence of the medicine should die from the injury, an insurance policy on the life of the person would thereby become void.  However, this question does not necessarily arise under the issues in this case.  The defense presented in that behalf by the answer is as follows:  "Further answering, defendant represents and shows unto the court that the said Pearle Sampson died from the effects of hyoscine, hydrobromide, and other poisons self-administered and with suicidal intent, and that by said act of self-destruction she thereby forfeited all rights under said certificate of insurance, as section 414 of defendant's by-laws, which are a part of the insurance contract and govern the plaintiff's rights thereunder," etc.  By this it will be seen that the defense presented is that the alleged poisons were self-administered "with suicidal intent" and that by "said act of self-destruction" she forfeited all rights under the policy, thus limiting the defense to the *intentional* self-destruction of the assured.  The questions of suicide and "suicidal intent" were submitted to the jury, and their verdict negatives the idea that the decedent intentionally committed suicide.

All questions of fact involved in this case were properly submitted to the jury, and they have decided the matters in dispute, and we find no warrant to interfere with their finding.

The judgment of the district court is therefore

AFFIRMED.

Root, J., not sitting.