No. 88,124

DAVID MAUNZ, heir at law of Dirk Maunz, deceased, and DAVID MAUNZ, Administrator of the Estate of Brenda Maunz, deceased, *Appellants*, v. MERCEDES PERALES, M.D., *Appellee*.

(76 P.3d 1027)

Opinion filed September 19, 2003.

*Edward J. Hund*, of Bradshaw, Johnson & Hund, of Wichita, argued the cause, and *Douglas D. Pletcher*, of the same firm, was with him on the brief for appellants.

*Don D. Gribble II*, of Hite, Fanning & Honeyman L.L.P., of Wichita, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

Nuss, J.: This is a medical malpractice action against a psychiatrist whose 16-year-old patient committed suicide after his discharge from a hospital. As plaintiffs, the parents of the patient, Dirk Maunz, alleged Dr. Mercedes Perales negligently assessed Dirk's risk of suicide and failed to formulate and follow an appropriate treatment plan. In response, Dr. Perales asserted Dirk's comparative fault under K.S.A. 60-258a.

Over plaintiffs' objection, the jury was allowed to compare fault and apportioned 79% of the fault for Dirk's death to Dirk and 21% to Dr. Perales. Plaintiffs appealed what was essentially a defense verdict, and we transferred the case from the Court of Appeals under K.S.A. 20-3018(c). The issue on appeal, and this court's accompanying holding, is as follows:

May comparative negligence be a defense in a medical malpractice case involving the suicide of a patient in a noncustodial setting? Yes.

Accordingly, the district court is affirmed.

## FACTS

The Maunz family physician, Dr. Ralph Bellar, first diagnosed Dirk's depression in February 1999. During that same month Brenda Maunz, Dirk's mother, had nearly died from the emphysema and heart problems with which she had suffered since 1996. Dirk found it difficult to deal with his mother's terminal condition and her impending death. In response to his symptoms of depression, Dr. Bellar prescribed Prozac.

While Dirk was prescribed medication, he did not always follow his doctor's regimen. Sarah Harding, his girlfriend during the early months of 1999, testified there were times when he would not take his medication due to stomach irritation or because he believed it inhibited his performance in sports. His parents' marital difficulties further complicated his life in the early months of 1999. Dirk feared they might separate and divorce. Additionally, because of his poor school attendance, his grades suffered, which resulted in his ineligibility to play football. The end of his relationship with Sarah in June 1999 added even more stress.

In response to Dirk's continuing depression, his mother took him to Horizons Mental Health Center (Horizons) in Harper County on September 24, 1999, for counseling. At that time, he received an initial evaluation and was seen a second time on October 1, 1999. Counselors scheduled him to return on October 8, but he missed his appointment. According to his former girlfriend Sarah, he began talking about killing himself during that week.

On Sunday, October 10, Dirk called Sarah around 10:30 p.m., told her he had a gun, and said, "[h]ave a nice life." Fearing Dirk meant to harm himself, Sarah immediately told her mother and called Dirk's mother. She then began searching for him and found him in his pickup on a dirt road 2 miles east of her house. When she approached his truck, she saw a shotgun in his mouth, so she opened the door and grabbed the gun. The two struggled, but she was able to take the gun away when the headlights of an approaching car distracted him. He exited his truck, and Sarah placed the shotgun in her car. Following some discussion, they returned to her house where they met several of Dirk's other friends. They subsequently escorted him home, and Sarah's brother took the shotgun, unloaded it and hid it under his bed.

The following day, Monday, October 11, Dirk's father, David Maunz, took him to Horizons. Janice Beougher, a Masters level psychologist and licensed clinical social worker, screened Dirk for admission to Via Christi Regional Medical Center, St. Joseph Campus (Via Christi) in Wichita. Beougher noted he was neat and clean, cooperative, and tearful, but not agitated. She testified Dirk expressed suicidal ideations to her. Based on her observations, her initial diagnosis was an unspecified depressive disorder. She felt that because Dirk had threatened suicide he needed placement in a secure setting with supervision. Around 6 p.m. that day, David admitted Dirk to the adolescent behavioral unit at Via Christi. David brought the screening assessment prepared by Beougher so that it could be included in Dirk's medical chart.

Kerri Miller, the admitting nurse, performed Dirk's initial assessment at Via Christi. She completed a nursing history, a patient admission assessment form, and a nurse's mental status exam, which rated Dirk's mental status based on a global assessment

score. Miller's exam indicated he had a "[m]ajor impairment in functioning in several areas, and [was] unable to function in one of these areas." Dr. Hitesh Pandya, a resident physician, also interviewed Dirk that evening and diagnosed him with a major depressive disorder. Dr. Pandya then placed him on a Level II suicide watch.

On Tuesday, October 12, David met with Dr. Pandya and Dr. Perales at Via Christi. Dr. Perales, who is a board certified psychiatrist and also Dr. Pandya's supervisor, reviewed the intake reports of both Dr. Pandya and nurse Miller and the screening analysis of Beougher. After reviewing the information contained in the hospital record, Dr. Perales met with Dirk for the first time. The meeting lasted approximately 1 hour, and they discussed his fear of losing his mother. Later that day she met with David for 45 minutes. Dr. Perales testified:

> "What I told him [David] was that Dirk and I had talked about the incident, and that he had told me about going out to the country with a shotgun. That he was wanting to die. That he had called Sarah. And that Sarah had come over, she knew where he was at. She would be the only one to know where he was at. And that she had grabbed the gun. And that they had struggled and that she had fell [*sic*] to the ground and he felt bad about that. And that he gave the gun to her. He also told me that he had been thinking about that since he had been in the hospital and that he appreciated that that was not the way to deal with his stressors. And that he had made a lot of people nervous about that. And that he really didn't want to die. That was the reason he had called Sarah. And that he had understood the seriousness of his—of his behavior. And that people did not need to worry about him."

David testified that Dr. Perales told him Dirk had not expressed any suicidal ideations since the night of Sunday, October 10. He questioned Dr. Perales about Dirk's medication because he did not feel the Prozac was working and also discussed the stressors in Dirk's life. He told Dr. Perales he believed there was more between Sarah and Dirk than what Dirk was telling her. Dr. Perales suggested Effexor as an alternative to Prozac and explained how the two drugs worked differently. David testified that he agreed to the change in Dirk's medication and that Dr. Perales scheduled a family counseling meeting for Friday, October 15, which was 3 days away.

Tuesday night Brenda went to see Dirk at Via Christi. Later, Brenda and David discussed the fact that Dirk wanted to come home. He did not like being in the hospital and was not getting much sleep due to the intrusiveness of suicide watch procedures and disturbances in his ward. While David initially told Dirk he had to stay in the hospital until after the scheduled family counseling meeting on Friday, he changed his mind after speaking with Brenda.

The next morning, Wednesday, October 13, David told Brenda he would call the hospital to determine if the doctors would discharge Dirk that day. He spoke with Dr. Pandya, who indicated he had Dr. Perales' consent for release. The doctors agreed that as long as the family had all the guns out of their house, they could release Dirk after 3:30 p.m. after he had attended several classes at the hospital that day.

Dr. Pandya testified that on October 13 he spoke with Dirk concerning his relationship with Sarah. Dirk assured him there was no problem. He told Dr. Pandya that though they had broken up a couple of months ago, they were still good friends. Dr. Pandya stated that based upon his evaluations of Dirk's improved outlook, insight, and judgment, he believed Dirk's condition had stabilized sufficiently to allow his treatment on an outpatient basis.

After David arrived to pick up Dirk, he noticed Dr. Perales at the nurses' station and initiated a conversation. Dr. Perales testified that she talked to him about Dirk's prescription and dosages. She reiterated to David that they needed to keep guns out of the house. When David asked her about the upcoming family meeting on Friday, October 15, she told him that since they were checking Dirk out of the hospital, per hospital rules a family meeting within the facility was no longer possible. After he asked if she could suggest a place to bring Dirk for outpatient treatment, she recommended a facility near their home. Dr. Perales further testified that David wanted to discuss Dirk's follow-up care with Brenda and then get back in touch to schedule an appointment.

On October 13, Dirk was discharged from Via Christi, 45 hours after his admission. David testified that although Dr. Perales expected an appointment to be made within a week after Dirk's dis-

charge, he and Brenda had not made a specific appointment by the time Dirk died. According to David, Dr. Perales did not impress upon him the urgency of getting an appointment for continuing care.

Marilea Struble, the mother of one of Dirk's friends, testified Dirk came by her home Wednesday, the day of his discharge, and spoke with her for a few hours. According to her, he was talkative, happy, and joked around. He did not appear to be any different than before his hospitalization. Her daughter, Marcie, also spoke with Dirk and concluded he was doing well.

Sarah also testified Dirk stopped by her house on the day of his discharge. She claimed he seemed normal to her, but he commented that the doctors were stupid and he hated the hospital. He indicated he "put on a bigger act," meaning he acted like he was okay when he was not. Dirk wanted to begin dating her again, but she told him she needed more time. He became angry when she refused his attempt at reconciliation.

David testified that in the days after Dirk's discharge, he did not see any indications his son continued to have problems. He seemed normal and happy.

On Thursday, October 14, the day after Dirk's discharge, he went to a local store and purchased shotgun shells. The following evening, Friday, October 15, while his friends were at a high school football game, he entered the Harding home and retrieved his father's shotgun that Sarah had taken from him days earlier. Two days later, on Sunday, October 17, family members discovered Dirk's body in his pickup in the driveway of their home. He had shot himself with the shotgun after leaving notes for both Brenda and Sarah.

On October 19, 2000, David and Brenda, as heirs and coadministrators of Dirk's estate, filed a wrongful death and survival action against Dr. Perales. Among the defenses asserted by Dr. Perales in her answer was the doctrine of comparative fault. Upon Brenda's death, her estate was substituted on her behalf with David as Administrator, and the survival action on behalf of Dirk's estate was dropped.

On September 20, 2001, plaintiffs filed motions in limine addressing, among other things, the issue of comparative fault. Plaintiffs generally contended it was unfair to compare the conduct of a suicidal patient who sought treatment with the negligence of the psychiatrist who treated the underlying mental illness. They specifically sought to exclude evidence regarding each of the five allegations of Dirk's conduct upon which Dr. Perales based her affirmative defense of comparative fault:

1. Not being candid about his emotional condition and stressors so the best possible health care could be delivered to him.
2. Going to the Harding house at night, while the Harding family was at the Chaparral High School football game, and retrieving the shotgun he used to take his life that was hidden under Seth Harding's bed.
3. Going to Alco and purchasing shotgun shells used to take his life.
4. Failing to seek assistance to deal with any return of his suicidal thoughts upon discharge from the hospital.
5. Purposefully taking his own life.

The district court denied the motion, holding that as a matter of law Dirk's fault would not be eliminated from the jury's consideration.

During the later jury instructions conference, plaintiffs' counsel did not specifically object to the text of instruction No. 7 regarding comparative fault for children, PIK Civ. 3d 105.02, but expressed that he was not waiving any objection to the court's allowing the comparison of Dirk's fault. Regarding instruction No. 8, which was a verbatim statement of PIK Civ. 3d 105.03, Comparative Fault — Explanation of Verdict, plaintiffs' counsel again reserved his general objection regarding the comparison of Dirk's fault. The trial judge replied: "And save yourself some breath, Mr. Hund. I will not take any of your statements in regard to this — the instructions and the presentation to the jury — as a waiver of any claims that you have made under the objections you have made."

Plaintiffs' counsel also requested instruction No. 7 be modified to add "a mentally ill person's conduct should be measured in light of that person's mental condition." He also requested modification to instruction No. 14 that would mention Dirk's diminished mental capacity. Both of these requests were denied, with the trial court

holding the mental capacity issue was adequately covered by the reference in instruction No. 7 to the child's "age, intelligence, capacity and experience" then existing. The trial court noted counsel's exceptions to the court's denials.

After the defense verdict, the plaintiffs appealed.

## DISCUSSION

Issue: *May comparative negligence be a defense in a medical malpractice case involving the suicide of a patient in a noncustodial setting?*

The parties disagree on the correct standard of this court's review. Plaintiffs argue our review is de novo, asserting the comparison of Dirk's fault under these circumstances is an issue of first impression and therefore a question of law. Defendant argues, however, our review is for abuse of discretion, asserting the comparison of Dirk's fault is evidentiary in nature since plaintiffs first raised it in a motion in limine. We agree with plaintiffs. This specific issue is one of first impression, necessarily involving an interpretation and application of the law. See *Kuhn v. Sandoz Pharmaceuticals Corp.*, 270 Kan. 443, 456, 14 P.3d 1170 (2000); *Kindel v. Ferco Rental, Inc.*, 258 Kan. 272, 277, 899 P.2d 1058 (1995). Our review of questions of law is unlimited. *Lindsey v. Miami County National Bank,* 267 Kan. 685, 689-90, 984 P.2d 719 (1999).

As plaintiffs' brief states, they "are asking this court to adopt a rule of law that prevents a negligent psychiatrist from asserting the patient's intentional act of suicide as a defense in comparative fault when suicide is the reasonably foreseeable harm." Consequently, they claim the trial court erred by allowing the jury to compare evidence of Dr. Perales' negligence to Dirk's misconduct in committing suicide. They further assert that allowing the comparison nullified the duty of care a psychiatrist owes to a suicidal patient — including the duty to prevent the suicide — and prevented any possibility of recovery from malpractice.

In response, Dr. Perales contends that if comparison of fault is disallowed, physicians become the ultimate insurers of their patients' successful treatment. According to her, if physicians erred in even the slightest degree, juries would always hold them liable,

no matter how minor the error committed by the physicians or how gross the fault of the patients. Finally, she points out that even the plaintiffs' own expert, Dr. Thomas Gutheil, stated that absolute prevention of suicide is not possible; the health care provider's task is to first assess and then decrease the risk.

We hold for the defendant for several reasons. First, our state legislature has statutorily established a policy of comparing the negligence of all persons involved in a civil wrong, in one trial, and awarding damages in tort based on comparative fault. K.S.A. 60-258a; *Eurich v. Alkire*, 224 Kan. 236, 237-38, 579 P.2d 1207 (1978); see *Brown v. Keill*, 224 Kan. 195, 197, 580 P.2d 867 (1978). In adopting comparative negligence our legislature, like others, has made it clear that people generally have a duty to exercise ordinary care for their own safety. See *Brown*, 224 Kan. 195; *Hobart v. Shin*, 185 Ill. 2d 283, 290, 705 N.E. 2d 907 (1998) (The Illinois Supreme Court makes the same observation.). In view of our legislature's clear determination, this court, like the *Hobart* court, should resist granting a judicial exemption from our legislature's mandate. See *Sheron v. Lutheran Medical Center*, 18 P.3d 796, 801 (Colo. App. 2000) (Blanket rule proposed by plaintiff that comparative negligence principles should not apply in wrongful death suicide cases in which it is alleged that health care providers failed to prevent the suicide would ignore the strong policy in Colorado of apportioning fault in tort actions.); *Birkner v. Salt Lake County*, 771 P.2d 1053, 1060-61 (Utah 1989)(Mental impairments and emotional disorders come in infinite degrees, and concluding that categorical rule that no patient seeking help for a mental or emotional disorder can be charged with negligence would be unrealistic and cause damage to the principles of comparative negligence.).

Second, the cases cited by plaintiffs are of dubious value because all but one involve a patient injured while in the physical custody of the defendant medical care provider. See *Tomfohr v. Mayo Foundation*, 450 N.W.2d 121 (Minn. 1990) (attempted suicide committed by mentally ill patient in locked hospital ward); *McNamara v. Honeyman*, 406 Mass. 43, 546 N.E.2d 139 (1989) (schizophrenic 20-year-old patient hanged herself after being admitted to mental health facility following suicide attempt); *Cowan v. Doer-*

*ing,* 111 N.J. 451, 545 A.2d 159 (1988) (plaintiff admitted to hospital ICU, then freed herself from her restraints and jumped from second floor window, suffering permanent injuries). These cases are in consensus that where a known, actively suicidal patient is hospitalized, the hospital and health care providers assume the patient's duty of self-care. In the instant case, however, Dirk had been discharged from custody before his suicide. Moreover, there is no specific allegation, and certainly no expert testimony, that Dirk's discharge itself was negligent. See *Hare v. Wendler,* 263 Kan. 434, 440-41, 949 P.2d 1141 (1997) (Generally, expert testimony is required in medical malpractice cases to establish the accepted standard of care and to prove causation.).

Plaintiffs' noncustodial case, *White v. Lawrence,* 975 S.W.2d 525 (Tenn. 1998), admittedly held that an alcoholic patient's intentional act of committing suicide would not be considered in assessing fault against the physician who covertly prescribed and administered medication that produced an unpleasant reaction to alcohol, because suicide was a foreseeable risk created by the alleged negligence. 975 S.W.2d at 530. *White* extended prior Tennessee case law which had limited the prohibition of comparative fault to third-party cases, *e.g., Turner v. Jordan,* 957 S.W.2d 815 (Tenn. 1997) (psychiatrist, whose negligence had allowed an aggressive patient to severely beat nurse at facility where he was being treated, not allowed to compare the intentional beating by the patient with his own negligence). Thus, earlier Tennessee law was consistent with present Kansas law prohibiting the comparison of intentional acts of a third party with the negligent acts of the defendant. See *Kansas State Bank & Trust Co., v. Specialized Transportation Services, Inc.,* 249 Kan. 348, Syl. ¶ 6, 819 P.2d 587 (1991); *Gould v. Taco Bell,* 239 Kan. 564, Syl. ¶ 4, 722 P.2d 511 (1986). We decline, however, to apply *White's* holding to the instant case and to extend the reach of *Kansas Bank & Trust Co.* and *Gould.*

Third, we find particularly persuasive the reasoning of the Illinois Supreme Court in a case similar to the instant one, *Hobart v. Shin,* 185 Ill. 2d 283. There, the trial court allowed a jury to consider the fault of a suicidal patient who later committed suicide after discharge from inpatient treatment using pills prescribed by

her physician. After a defense verdict, the appellate court reversed and remanded for a new trial, holding that the affirmative defense of contributory negligence was inappropriate. 185 Ill. 2d 289. The Supreme Court reversed and explained its decision to permit jury evaluation of the victim's fault as follows:

" '[T]he issue of contributory negligence of a mentally disturbed person is a question of fact; unless, of course, the evidence discloses that the person whose actions are being judged is completely devoid of reason. If he is so mentally ill that he is incapable of being contributorily negligent, he would be entitled to have the jury so instructed . . . . But only in those cases in which the evidence would admit to no other rational conclusion would plaintiff be entitled to have the issue determined as a matter of law.' *De Martini v. Alexander Sanitarium, Inc.*, 192 Cal. App. 2d 442, 447, 13 Cal. Rptr. 564, 567 (1961).

"To rule otherwise would make the doctor the absolute insurer of any patient exhibiting suicidal tendencies. The consequence of such a ruling would be that no health care provider would want to risk the liability exposure in treating such a patient, and, thus, suicidal persons would be denied necessary treatment. Public policy cannot condone such a result." 185 Ill. 2d at 290-91.

Under statutory language similar to that in Kansas' comparative negligence statute, K.S.A. 60-258a, the *Shin* court allowed the intentional conduct of the decedent, *i.e.*, refusing to contact her doctors, leaving home and checking into a motel under a fictitious name where she committed suicide, to be compared with the negligent conduct of the defendant physician. 185 Ill. 2d at 291.

In accord is *Champagne v. United States*, 513 N.W.2d 75 (N. D. 1994). There, 18-year-old Ricky Champagne attempted suicide with an overdose of medication and was admitted to a hospital. Two days later he was discharged, and 4 weeks after discharge he shot himself. On a certified question from the Eighth Circuit Court of Appeals, the North Dakota Supreme Court held that a suicide victim's fault could be considered under the state's comparative fault statutes:

"We are not persuaded by the Champagnes' argument that, when a patient's act of suicide is a foreseeable result of a medical provider's failure to treat reasonably to prevent the suicide, it is never appropriate to compare the victim's act of suicide with the medical provider's fault. Rather, if the evidence shows that the patient is *incapable* of being responsible for his own care and that the medical provider has undertaken the duty of care for the patient's well-being, there would be no allocation of fault to the patient. *Tomfohr v. Mayo Foundation*, 450 N.W.2d

121 (Minn. 1990); *Cowan v. Doering,* 111 N.J. 451, 545 A.2d 159 (1988). [But] [i]f the medical provider has taken on the duty of caring for a patient with a diminished capacity, and if the patient *is capable* of being responsible for his own care, allocation of fault is in order." (Emphasis added.) 513 N.W.2d at 80.

See also *Sheron v. Lutheran Medical Center,* 18 P.3d at 801 (upheld trial court's instruction to jury allowing consideration of negligence of suicide patient who, after release from emergency room, committed suicide the next day).

Even the custodial cases cited by plaintiffs are in consensus that juries may consider proof of the patient's fault where health care providers have not assumed the patient's duty of self-care. If a mentally disturbed patient is capable of exercising care for himself or herself, that patient must act reasonably considering the reduced capacity exercised. Indeed, in *Cowan,* the main case relied upon by plaintiffs, the New Jersey Supreme court stated:

"Thus, in a case in which an accident involves an apparently negligent plaintiff who is mentally disturbed, contributory negligence is an issue that should be determined under the capacity-based standard. This issue, however, does not present itself in this case because the plaintiff's inability to exercise reasonable self-care attributable to her mental disability was itself subsumed within the duty of care defendants owed to her." 111 N.J. at 460.

See also *Tomfohr,* 450 N.W.2d at 124-25 (rejection of comparative negligence defense admittedly limited to the type of factual situation presented by that case, to wit, an attempted suicide committed by a mentally ill patient admitted to locked hospital ward where the medical staff was aware of suicidal ideations); *McNamara,* 406 Mass. at 55 (mentally ill person can be comparatively negligent in some circumstances).

Fourth, while this court has not previously considered the issue of comparative fault under circumstances similar to the instant case, it has allowed a jury to consider a patient's negligence or fault when the patient failed to follow the directions of a health care provider and the patient's actions resulted in harm to himself or herself. Beginning in 1926, this court recognized a patient's duty to follow the reasonable directions and advice of his or her physician. See *Parr v. Young,* 121 Kan. 47, 50, 246 Pac. 181 (1926). Similarly, in *Wisker v. Hart,* 244 Kan. 36, 766 P.2d 168 (1988),

Wisker had disregarded his doctor's warnings to refrain from strenuous work after he suffered internal injuries in a motorcycle accident and to contact the doctor if his condition changed. After he returned to his physically demanding job, he fell ill and died from complications of a lacerated liver. This court upheld a verdict in which a jury found Wisker 60% at fault for his own death, precluding any recovery under K.S.A. 60-258a. 244 Kan. at 40-42.

Likewise, in *Cox v. Lesko*, 263 Kan. 805, 819-20, 953 P.2d 1033 (1998), this court permitted a jury to consider as plaintiff's fault — not just as failure to mitigate damages — her failure to complete doctor-ordered physical therapy when evidence indicated her inaction exacerbated her damages. The jury found her 70% at fault, the doctor 30% at fault, and she was denied recovery. Additionally, PIK Civ. 3d 123.20, Duty of Patient, was an instruction given in the instant case and acknowledges that the patient's failure to follow reasonable medical advice may absolve the health care provider from liability for any increased injury caused by patient's failure to accept reasonable treatment and advice.

Finally, while *Parr, Wisker,* and *Cox* did not involve plaintiffs with diminished mental capacity, we have long considered the mental capacity of the plaintiff when determining fault. See *Noel v. McCaig*, 174 Kan. 677, 685-86, 258 P.2d 234 (1953) (The fact of a person's limited intelligence must be given weight in determining whether the person thus deficient has been guilty of contributory negligence.); *Avey v. St. Francis Hospital & School of Nursing*, 201 Kan. 687, 442 P.2d 1013 (1968). In *Avey*, this court reversed and remanded because, among other things, the jury instruction failed to consider the mental capacity of plaintiff — a clinically depressed patient injured while hospitalized — as a factor in instructing on plaintiff's duty of care. 201 Kan. at 699-700. Citing *Noel*, 174 Kan. 677, this court stated:

"This court has recognized that the mental condition of a person, so far as his incapacity is known to the person charged with a duty of care, must be given weight in determining whether a person thus deficient has been guilty of contributory negligence, and when warranted by the evidence, mental condition is a factor to be considered by the jury . . . . [Citations omitted.]" *Avery*, 201 Kan. at 700.

As we noted in *Honeycutt v. City of Wichita*, 247 Kan. 250, 796 P.2d 549 (1990), the change of statutory scheme from contributory negligence to comparative fault makes no difference to our analysis. "If contributory negligence or an analogous defense would have been a defense to a claim before comparative fault was adopted, then the comparative negligence statute is applicable to the same facts. [Citations omitted.]" 247 Kan. at 256.

These results place Kansas courts squarely within the majority of jurisdictions considering this issue as was noted in 57A Am. Jur. 2d, Negligence § 956:

"A majority of courts take the view that a diminished mental capacity not amounting to outright insanity or incompetence may be taken into consideration by the jury in determining whether the plaintiff [patient] has exercised the requisite degree of care for his own safety. Thus, it has been stated that even some lesser degree of mental impairment than retardation or psychosis may preclude a finding of contributory negligence, if the plaintiff's [patient's] faculties are not sufficient to perceive and avoid a particular risk of harm.

"In support of this position, it has been said that the plaintiff [patient] is held to exercise only such faculties and capacities as he is endowed with by nature for the avoidance of danger, and what may be justly held to be contributory negligence in one is not necessarily such in another. Thus, if the evidence is not such as to admit of no other rational conclusion than that the plaintiff's [patient] mental incapacity was such as to render him incapable of contributory negligence as a matter of law, the evidence may nevertheless suffice to present an issue of fact for the jury as to whether plaintiff [patient] was accountable for his own actions."

Considering the statutory and case law of our State and the persuasive opinions of other jurisdictions cited above, under the circumstances of this case a jury should be allowed to evaluate the comparative fault of the parties, and its evaluation should be under a capacity-based standard. As noted in other jurisdictions, this standard recognizes that a mentally disturbed patient is not capable of adhering to a reasonable person's standard of self-care in furthering his or her own mental health care, but at the same time holds that patient responsible for the consequences of conduct that is unreasonable in light of the patient's capacity and resultant ability to cooperate in treatment. As the plaintiffs do not claim Dirk was so mentally incapacitated as to be without reason, nor have they shown Dr. Perales assumed Dirk's duty of self-care by placing him

in an institutional setting, the trial court did not err in allowing the jury to consider the conduct of Dirk.

As part of plaintiffs' overall objection to allowing Dirk's conduct to be compared with Dr. Perales', they objected to several jury instructions at the trial court. They do not assert erroneous jury instructions, however, as an issue on appeal. We therefore need not address that issue. See *Goldbarth v. Kansas State Board of Regents*, 269 Kan. 881, 884, 9 P.3d 1251 (2000).

Affirmed.

ABBOTT, J., not participating.

BRAZIL, S.J., assigned.