NOT DESIGNATED FOR PUBLICATION

No. 121,880

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SARAH M. BARRON, as the Representative Heir of
Barbara J. Barron; and
ROBERT S. BARRON, as Special Administrator of
the Estate of Barbara J. Barron,
*Appellants*,

v.

TREASURE A. WEHNER, D.O.,
*Appellee*.


MEMORANDUM OPINION


Appeal from Cowley District Court; NICHOLAS M. ST. PETER, judge. Opinion filed February 19, 2021. Affirmed.

*Blake A. Shuart*, of Hutton & Hutton Law Firm, LLC, of Wichita, for appellants.

*Brian L. White* and *Mark R. Maloney*, of Hinkle Law Firm, LLC, of Wichita, for appellee.

Before WARNER, P.J., POWELL, J., and MCANANY, S.J.


PER CURIAM: This case arises from the care and death of Barbara J. Barron. Robert S. Barron, Barbara's husband and special administrator of her estate, and Sarah M. Barron, Barbara's daughter and representative heir, brought this medical malpractice action against Dr. Treasure Wehner for her failure to transfer Barbara to a tertiary care hospital on March 10, 2013, and March 18, 2013, which they claim resulted in her untimely demise. Wehner raised Barbara's comparative fault as a defense, asserting that Barbara's failure to undergo a CT angiogram in January 2013 when ordered by her

1

physician contributed to her death. At the close of the evidence, the Barrons sought dismissal of Wehner's comparative fault claim on the grounds of insufficient evidence. The district court denied the motion, and the jury returned a verdict in Wehner's favor, finding Barbara was 60% at fault.

On appeal, the Barrons challenge the sufficiency of the evidence supporting Wehner's comparative fault claim and the jury's verdict. Given that challenges to the sufficiency of the evidence require us to view the evidence in the light most favorable to Wehner, a careful examination of the record reveals sufficient evidence for a reasonable juror to reach the same verdict as the jury did here. Thus, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1.    *Medical Treatment*

On January 18, 2013, Barbara visited the William Newton Hospital emergency department complaining of shortness of breath with activity. She had an elevated breath rate of 24 breaths per minute. Barbara also had bilateral swelling in her legs. A D-dimer test (used to evaluate the potential for blood clots), was elevated at 252 ng/ml. Barbara's oxygen level (O2) was within normal limits, and her chest x-ray was negative for any acute disease. The emergency department physician, Dr. Mark Ohlde, ordered a CT angiogram of Barbara's chest. After several failed attempts to start an IV, Barbara refused the CT angiogram and left the hospital after a breathing treatment. Dr. Ohlde did not rule out a pulmonary embolism (blood clots in the lungs) and ensured Barbara was aware of its potential lethality.

Barbara returned to William Newton on March 5, again complaining of shortness of breath. Her respiration rate was elevated, but her O2 was within normal limits and her chest x-ray was normal. Barbara also had bilateral swelling in her legs. Her creatine level

2

(used to evaluate kidney function) was elevated. Barbara was diagnosed with hyperventilation syndrome, dyspnea (shortness of breath), and anemia and was discharged to her home. Barbara visited her primary care physician at Westside Clinic on March 6 and 8. She was prescribed pain medications and antibiotics.

On March 10, 2013, Barbara returned to the William Newton Hospital emergency department and was initially seen by Wehner. Once again, her chief complaint was shortness of breath. Barbara's respiration rate was elevated at 30 breaths per minute, but her O2 was within normal limits. Barbara again had bilateral swelling in her legs, with the worst swelling in her left leg. Barbara's D-dimer was still elevated at 509 ng/ml, and her creatine level was elevated at 1.9. Wehner ordered a venous Doppler ultrasound of Barbara's left leg to check for deep vein thrombosis. Because Wehner's 12-hour shift was ending, she transferred care to the incoming emergency room physician, Dr. David Henderson. Unfortunately, and for reasons not shown in the record, the ultrasound was wrongly performed on Barbara's right leg instead of her left leg and tested negative for deep vein thrombosis. Henderson discharged Barbara and told her to follow up with her primary care physician in two to three days if her symptoms worsened.

Barbara visited the Westside Clinic on March 18 and was again seen by Wehner. Barbara continued to suffer from shortness of breath. Wehner wanted to perform a CT angiogram but Barbara's lab work revealed her creatine level was too high.

Wehner arranged to have Barbara admitted at William Newton Hospital the next day. Wehner turned Barbara's care over to Dr. Wade Turner because Wehner was leaving the next day for vacation. The next afternoon, Turner arranged Barbara's transfer to Via Christi St. Francis Hospital in Wichita due to her worsening condition.

Barbara was transported to Via Christi by ambulance, and her respiratory function continued to decline. Barbara remained at Via Christi until her death on April 16, 2013.

Her death certificate listed her causes of death as pneumonia secondary to acute respiratory distress syndrome and sepsis. No autopsy was performed.

2.      *Procedural History*

The Barrons filed the present medical malpractice suit against Wehner, alleging Wehner was negligent in her treatment of Barbara because Wehner did not transfer her to a tertiary care center on March 10 or March 18, 2013. Wehner answered and raised as a defense Barbara's comparative fault for refusing the CT angiogram on January 18, 2013.

3.      *Jury Trial*

The case was tried before the jury over a five-day period. Robert, Sarah, and Wehner all testified as did four medical experts, two for each side.

The Barrons' first expert was Dr. John Shufeldt, who practices in both emergency room and urgent care settings. Shufeldt testified Barbara's medical record on March 10 "screamed" pulmonary embolism because she was short of breath, heavy set, had a swollen leg, and was not very active. Moreover, her elevated D-dimer test and normal chest x-ray contributed to his view. Shufeldt explained the timeframe from when a pulmonary embolism begins and death can range from instant to never. Shufeldt admitted Barbara's symptoms also existed on January 18 but believed a pulmonary embolism was less likely to be present then than on March 10. Shufeldt testified the standard of care required Wehner transfer Barbara on March 10 and March 18.

Dr. Gary Salzman, a specialist in internal medicine, pulmonary disease, and critical care medicine, was the Barrons' second expert. Salzman believed Barbara's respiratory condition began in January 2013 and testified Barbara more likely than not would have been saved if she had been transferred to a tertiary care hospital on or before

4

March 18, 2013. Salzman believed Barbara's cause of death was multifactorial, including acute respiratory distress syndrome, sepsis, pneumonia, and vasculitis. He testified that the medical record did not allow him to diagnose Barbara as having a pulmonary embolism to a reasonable degree of medical certainty.

Wehner's first expert witness was Dr. Guy Grabau, who practices internal and pulmonary medicine. Grabau testified Barbara exhibited signs and symptoms of congestive heart failure and claimed congestive heart failure caused her respiratory condition, which was exacerbated by her treatment at Via Christi. Grabau testified Barbara was salvageable and treatable when transferred to Via Christi on March 20. Grabau testified had a CT angiogram been performed on January 18, 2013, it would have been negative for a pulmonary embolism.

Dr. Douglas Knox, a family medicine and emergency physician, was Wehner's second expert. Knox testified Wehner had met the standard of care in all respects. Part of his testimony focused on Barbara's January 18 emergency department visit, and Knox testified a CT angiogram is the "gold standard" and the only way to definitively diagnose the existence of a pulmonary embolism. Knox emphasized the importance of Barbara's failure to have a CT angiogram on January 18 because her poor kidney function prevented her from later receiving the contrast dye used in a CT angiogram later. On cross-examination, Knox explained, "Her refusal to get the [CT] study was paramount. . . . She didn't have the test done to see if it was negative or not. A lot of times these studies have some pulmonary emboli, that says the patient is developing and having pulmonary emboli."

Following the close of evidence, but before the case was submitted to the jury, the Barrons orally moved for judgment as a matter of law on Wehner's comparative fault claim, arguing there was insufficient evidence to allow the jury to find Barbara's refusal of the CT angiogram on January 18 caused her death. The district court denied the

5

motion, stating there had been evidence presented supporting the claim that her refusal of the CT angiogram impacted the course of her treatment.

The jury returned a verdict in favor of Wehner, finding Barbara 60% responsible for her death and Wehner 40% responsible. The Barrons sought a new trial on the grounds that insufficient evidence supported the jury's verdict, but the district court denied this motion.

The Barrons timely appeal.

ANALYSIS

I.  DID THE DISTRICT COURT ERR IN DENYING THE BARRONS' MOTION FOR JUDGMENT AS A MATTER OF LAW ON WEHNER'S COMPARATIVE FAULT CLAIM?

The Barrons raise two similar issues on appeal. First, they argue the district court's denial of their motion for judgment as a matter of law was erroneous because substantial evidence did not support Wehner's comparative fault claim against Barbara. The essence of their argument is that Wehner failed to prove Barbara's refusal to undergo the CT angiogram on January 18 caused her death. The Barrons also assert that no expert witness testified the CT scan would have shown a pulmonary embolism on January 18 and, therefore, Barbara's refusal did not lead to her death. Wehner views the Barrons' two issues as a single argument and generally discusses sufficiency of the evidence without differentiating between the issues. Wehner argues the symptoms present in Barbara in March 2013 were also present on January 2013, and she relies on Knox's testimony that a CT angiogram is the only way to definitively rule in or out a pulmonary embolism. Because January 18 ended up being Barbara's only opportunity to receive a CT angiogram, her failure to do so inhibited Wehner and the other doctors from properly treating Barbara.

A.    *Standard of Review*

Neither party presents the wholly correct standard of review. The Barrons argue the standard of review for motions for a new trial and for evidentiary rulings is abuse of discretion. Wehner notes that review of motions for judgment as a matter of law resolves all facts and inferences in favor of the nonmoving party but does not discuss the standard of review.

We review a district court's denial of a motion for judgment as a matter of law (previously called a directed verdict) de novo, "asking whether evidence existed from which a reasonable jury 'could properly find a verdict for the nonmoving party.'" *Siruta v. Siruta*, 301 Kan. 757, 766, 348 P.3d 549 (2015); see K.S.A. 2019 Supp. 60-250(a)(1). Similar to our review of the denial of summary judgment by a district court, our task is to "'"resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought,"'" and, "'"[w]here reasonable minds could reach different conclusions based on the evidence, the motion must be denied.'" [Citations omitted.]'" 301 Kan. at 766. Even when facts are undisputed, if conflicting inferences can be drawn from those facts, the issues are for the jury to decide. *Sexsmith v. Union Pacific Railroad*, 209 Kan 99, 103, 495 P.2d 930 (1972). A district court must deny a motion for judgment as a matter of law when "evidence exists upon which a jury could properly find a verdict for the nonmoving party." *Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 40, 169 P.3d 1052 (2007).

B.    *Analysis*

Following the close of the evidence, the Barrons moved for judgment as a matter of law on Wehner's comparative fault claim. Wehner's comparative fault claim asserted that Barbara's failure to undergo a CT angiogram on January 13 caused or contributed to her own death. The Barrons argued Wehner had failed to provide any evidence Barbara's

actions caused her death. The district court denied the motion, finding the testimony from Wehner's witnesses sufficient for a jury to find Barbara was at fault for her death.

Comparative fault requires the weighing of the causal negligence of all parties whose conduct brought about the harm and the imposition of individual liability for damages based upon the proportionate fault of each party. Fault consists of two components—negligence and causation. Negligence is a lack of ordinary care. It is the failure of a person to do something an ordinary person would do or the doing of something that an ordinary person would not do. *Zak v. Riffel*, 34 Kan. App. 2d 93, 101, 115 P.3d 165 (2005). Under comparative fault, "'[a] party is at fault when he or she is negligent and that negligence caused or contributed to the event which brought about the injury or damages for which a claim is made.'" *Fisher v. Kansas Crime Victims Compensation Board*, 280 Kan. 601, 607, 124 P.3d 74 (2005); *Zak*, 34 Kan. App. 2d at 101. Thus, to establish comparative fault, Wehner was required to present sufficient evidence that Barbara was negligent and that her negligence caused or contributed to her illness and death.

Significantly, the Barrons do not address the issue of Barbara's negligence in refusing a CT angiogram on January 18. The record shows that Barbara's refusal of the CT angiogram was in the context of the health care workers' inability to find a suitable vein for the contrast IV, resulting in multiple jabs to her arm, suggesting that Barbara's ultimate refusal of the scan was due to possible frustration and may have been reasonable. Nevertheless, the Barrons' failure to address the issue results in its waiver. See *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018).

However, the Barrons do seize on the causation element, drilling down on the requirements necessary to prove causation. Relying on *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, Syl. ¶ 5, 228 P.3d 1048 (2010), the Barrons set forth their test for what a party is required to prove in a medical malpractice case:  (1) The health

care provider owed the patient a duty of care and was required to meet that care to protect the patient from injury; (2) the health care provider breached that duty or deviated from the applicable standard of care; (3) the patient was injured; and (4) the breach of duty or deviation from the standard of care proximately caused the patient's injury. The Barrons focus on the probable cause requirement and illustrate in their brief how Wehner did not show Barbara's refusal of a CT angiogram proximately caused her death.

The Barrons' argument runs into two roadblocks. First, the *Puckett* test is the plaintiff's requirement to prove a health care provider committed medical malpractice. The issue here is whether the health care provider, Wehner, presented sufficient evidence that a jury could find the patient, Barbara, was at fault for her illness and death—the opposite of the issue in *Puckett*. In other words, nothing in *Puckett* suggests comparative fault requires this test to be applied in reverse when the health care provider alleges the patient was at fault.

Second, the Barrons' focus on proximate cause is misplaced in this context. "'Kansas has moved beyond the concept of proximate cause in negligence' in favor of a system in which "'all or nothing' concepts are swept aside'" and 'courts compare the percentages of fault of all alleged wrongdoers.'" *Kudlacik v. Johnny's Shawnee, Inc.*, 309 Kan. 788, 794, 440 P.3d 576 (2019). "Proximate cause is not an obsolete concept in Kansas law, but when it has been mentioned by this court in recent years it typically has been in a criminal context." *Reynolds v. Kansas Department of Transportation*, 273 Kan. 261, 268, 43 P.3d 799 (2002). Instead, in a comparative fault system, "'[a] party is at fault when [the party] is negligent and that negligence caused or contributed to the event which brought about the injury.'" 273 Kan. at 269.

In Kansas, a patient has a duty to follow the reasonable directions and advice given by a health care provider. *Zak*, 34 Kan. App. 2d at 102. A jury may consider a patient's negligence or fault when the patient does not follow the directions of a health

9

care provider and the patient's failure to do so results in harm to the patient. *Maunz v. Perales*, 276 Kan. 313, 324, 76 P.3d 1027 (2003). As mentioned above, the Barrons do not claim Barbara was not negligent. The issue is whether the evidence supports a finding that her negligence in refusing the CT angiogram caused her death.

When viewing the evidence in the light most favorable to Wehner, see *Siruta*, 301 Kan. at 766, we cannot agree with the Barrons' assertion that no evidence exists to support Wehner's comparative fault claim. While the evidence of Barbara's contributory negligence is undoubtedly highly conflicted, our standard of review forbids us from reweighing that evidence. See *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 407, 266 P.3d 516 (2011). Thus, we conclude the district court was correct in finding sufficient evidence existed such that a reasonable jury could find Barbara was at fault for her illness and death. On January 18, Ohlde informed Barbara of the importance of receiving a CT angiogram and the potential lethality of a pulmonary embolism. With that knowledge, Barbara refused the test. Shufeldt admitted Barbara's symptoms were present at her doctor's visit on January 18, 2013, and the same symptoms continued until Barbara's death in April 2013. The Barrons' claim asserted Wehner was at fault for Barbara's death because of Wehner's failure to transfer Barbara to a hospital in Wichita on March 10 and March 18, 2013. At those visits, Barbara complained of the same shortness of breath she complained of on January 18.

Knox explained a CT angiogram is the "gold standard" test for pulmonary embolism and, in fact, is the only way to definitively rule out the existence of a pulmonary embolism. Other tests, like the VQ scan mentioned throughout the trial, which involves the inhaling of radioactive material, only provide a probability of a pulmonary embolism. As Knox testified, January 18 ended up being the last opportunity for Barbara to receive a CT angiogram. At her doctor visits on March 10 and March 18, Barbara's kidney functions were too low to permit a CT angiogram.

An autopsy was not performed on Barbara, and a pulmonary embolism was never definitively ruled in or out. One of the Barrons' expert witnesses, Salzman, was not sure Barbara had a pulmonary embolism and testified her death was multifactorial. Their other expert, Shufeldt, testified Barbara's condition was caused by a pulmonary embolism. Shufeldt believed Barbara had a pulmonary embolism in March, though he testified it was less likely she had one on January 18.

Thus, the evidence is sufficient for a reasonable jury to find Barbara's refusal of a CT angiogram was a cause of her death. No one knows for sure if Barbara had a pulmonary embolism on January 18. But whether she did or did not, a jury could have found the test was necessary to properly treat Barbara. Until her death, the doctors treated Barbara under the assumption that she may have a pulmonary embolism. A negative result from the test could have been just as important as a positive result. Additionally, even if the jury considered Shufeldt's and Knox's testimony that a pulmonary embolism was less likely to be present on January 18, Knox testified a CT angiogram could also reveal the development of a pulmonary embolism.

In viewing the testimony in favor of Wehner and resolving all facts and inferences from the evidence in her favor, reasonable minds could find Barbara's actions were a cause of her eventual death. The district court did not err in denying the Barrons' motion for a judgment as a matter of law.

II.    DID SUFFICIENT EVIDENCE EXIST TO FIND BARBARA WAS PARTIALLY AT FAULT FOR HER DEATH?

The Barrons also argue there was not sufficient evidence for the jury to find Barbara's refusal to undergo a CT angiogram was a cause of her death. The Barrons explain this sufficiency of the evidence argument is "inherently connected" with their first argument. We agree, as the Barrons' argument on sufficiency of the evidence to

11

support the jury's finding is related to their previous argument concerning whether they were entitled to judgment as a matter of law on Wehner's comparative fault claim. See *Wolfe Electric, Inc.*, 293 Kan. at 407.

> "'When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of the appellate court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal.' [Citation omitted.]" 293 Kan. at 407.

For the same reasons as discussed previously, sufficient evidence exists under this favorable standard of review to support the jury's finding that Barbara was partially at fault for her death because she refused the CT angiogram on January 18. The CT angiogram on January 18 was the only opportunity to determine if Barbara had a pulmonary embolism. Her refusal of the test inhibited Wehner's and the other doctors' ability to treat Barbara. At trial, Shufeldt testified Barbara's symptoms "screamed" pulmonary embolism in March and her symptoms in January were the same; Knox testified about the importance of Barbara undergoing a CT angiogram.

Viewing the evidence in the light most favorable to Wehner, sufficient evidence was presented at trial to support the jury's finding on Wehner's comparative fault defense that Barbara was partially at fault for her death.

Affirmed.