# IN THE SUPREME COURT OF IOWA

No. 08–1478

Filed June 24, 2011

TODD A. MULHERN, Individually and
as Representative of the Estate of
Elizabeth M. Von Linden,

     Appellant,

vs.

CATHOLIC HEALTH INITIATIVES
a/k/a CATHOLIC HEALTH INITIATIVES
IOWA CORP. d/b/a MERCY FRANKLIN
CENTER and/or MERCY HOSPITAL
and/or MERCY PSYCHIATRIC SERVICES,

     Appellee.

---

Appeal from the Iowa District Court for Polk County, Donna L. Paulsen, Judge.

An estate appeals an adverse jury verdict in a medical negligence action. **AFFIRMED.**

Andrew J. Stoltze and Bruce H. Stoltze of Stoltze & Updegraff, P.C., Des Moines, and Christopher A. Kragnes, Des Moines, for appellant.

Stacie M. Codr and Connie L. Diekema of Finley, Alt, Smith, Scharnberg, Craig, Hilmes & Gaffney, P.C., Des Moines, for appellee.

**WATERMAN, Justice.**

Elizabeth Von Linden, a successful business executive, took her own life three weeks after she was discharged as an inpatient from defendant Mercy Hospital's psychiatric ward and six days after her outpatient office visit with Mercy's psychiatrist. Her husband brought a wrongful death action against Mercy, alleging negligent care. Mercy raised defenses, including Von Linden's comparative negligence. The trial court allowed the jury to decide their negligence. The jury found both Mercy and Von Linden negligent and allocated ninety percent of the total fault to Von Linden and ten percent to Mercy, resulting in a defense verdict. We are asked to decide whether our state's comparative fault act, Iowa Code chapter 668 (2003), permits a jury to compare the fault of a noncustodial suicide victim with the negligence of the mental health professionals treating her. We determine Von Linden owed a duty of self-care as an outpatient, and the district court committed no reversible error in allowing the jury to compare her fault. We therefore affirm the judgment for Mercy.

"Suicide has long been the subject of intense religious, ethical, legal and medical debate." *Brandvain v. Ridgeview Inst., Inc.*, 372 S.E.2d 265, 271 (Ga. Ct. App. 1988) (citing Victor E. Schwartz, *Civil Liability for Causing Suicide: A Synthesis of Law and Psychiatry*, 24 Vand. L. Rev. 217 (1971)). "A medical provider treating a patient with suicidal ideas presents a uniquely complex situation for comparative fault." *Champagne v. United States*, 513 N.W.2d 75, 78 (N.D. 1994). As discussed below, courts have reached divergent conclusions on how to allocate legal responsibility for suicide between the victims and the mental health professionals treating them. Each case turns on its uniquely tragic facts. Our resolution under Iowa law is based on the

record made below and is guided by well-reasoned precedent from other states where the overwhelming majority of courts allow juries to compare the fault of a noncustodial patient who commits suicide.

## I. Background Facts and Proceedings.

Elizabeth Von Linden, age forty, was in charge of consumer marketing at a large media company. Her job involved substantial travel and stress. She had a history of recurrent episodes of severe depression with interepisode recovery throughout her adult life. During college, she attempted suicide by slitting her wrists and overdosing on sleeping pills. She dropped out of college and, for roughly twenty years, was a functional alcoholic. After attending Alcoholics Anonymous, she stopped drinking. Her sobriety followed a second suicide attempt by carbon monoxide poisoning. She went many years with no medical treatment for her depression.

In late 1999, Von Linden met Todd Mulhern. Mulhern moved in with Von Linden in 2000. Mulhern and Von Linden were married in May 2002. Mulhern, Von Linden, and his ten-year-old daughter initially lived in Von Linden's home in Des Moines. Von Linden and Mulhern then purchased a larger house on the same block and moved in, but had difficulty selling her old house. The financial stress of owning two houses largely fell on Von Linden as the primary breadwinner. This financial stress coupled with work pressures worsened Von Linden's depression, culminating in a suicide attempt on June 6, 2003.

For the two preceding weeks, Von Linden had experienced suicidal thoughts. That night she decided to take her own life. Von Linden, in the middle of the night, went downstairs into the garage and taped a vacuum hose from the tailpipe of her car to run into the back window. She ingested prescription painkillers and Xanax, turned her car on, and

fell asleep. The heat from the tailpipe melted the vacuum hose. Mulhern awoke to the odor of car exhaust. He ran downstairs into the garage to find Von Linden, responsive but lethargic, in her car. He took her to Mercy Medical Center's emergency room.

An emergency room physician assessed Von Linden, conducted lab tests, and called Mercy Franklin Center—Mercy's behavioral health section—for a psychiatric evaluation. In the emergency room, Von Linden continued to express suicidal ideations by stating, "I wish it would end" and "I'm sorry I didn't die." Von Linden consented, however, to being hospitalized.

Von Linden was admitted into the psychiatric ward in the early afternoon of June 6 and spent the next two days there. The medical staff placed Von Linden on a suicide watch upon her admission. Dr. Charles Scott Jennisch, a psychiatrist, was her primary physician. He had not treated her previously. Dr. Jennisch met with Von Linden on June 6 for several hours. He diagnosed her with recurrent, severe major depressive disorder and placed her on new medications. He educated her about the nature of her illness and treatment options. She told him she had never heard such detailed information before, and it gave her hope. She asked to have a short hospital stay followed by outpatient treatment. That night, Von Linden slept well, and the next morning Dr. Jennisch noted she appeared brighter and more hopeful with reduced anxiety.

Dr. Jennisch met with Von Linden and Mulhern again on June 7 and discussed in depth her illness and treatment recommendations. Von Linden told Dr. Jennisch "none of the stressors related to the house are worth dying for." She denied any suicidal ideation that day. She expressed regret for her suicide attempt and confidence about the

potential to treat her illness. She reiterated she did not want inpatient treatment. Both she and her husband asked that she return home that day. Dr. Jennisch discouraged discharge and recommended she remain hospitalized at least another day. She agreed. He discussed educational support with her and the transition to outpatient services at his clinic. He recommended that, after her release as an inpatient, Von Linden participate in a "partial hospitalization" program from 9 a.m. to 3 p.m. daily. She reported improvements in her symptoms and said she did not feel she needed intense inpatient treatment or the partial hospitalization program. Both she and her husband asked that she return to work as quickly as possible.

On June 8, Dr. Jennisch met with Von Linden again. Her condition had markedly improved, and she had met all inpatient treatment goals. Von Linden and her husband asked that she go home. Dr. Jennisch spoke with Von Linden about outpatient treatment plans and gave her written discharge instructions. Von Linden was instructed to remain on the medications and schedule follow-up visits with Dr. Jennisch and with a psychologist for therapy. Finally, she was to attend the "women and self-esteem" and "stress management" group therapy sessions at Mercy Franklin Center. Dr. Jennisch went over these instructions with Von Linden. She was given several emergency numbers, including Dr. Jennisch's and a Help Center number she was to call day or night if her condition worsened. Dr. Jennisch "made it clear to her" she was to call if she had any concerns. Von Linden told Dr. Jennisch that, "if things changed or deteriorated as opposed to actually attempting to take her life, . . . she would be very comfortable in either coming to the Help Center . . . or in calling [his] clinic." The discharge summary states "[f]ollow-up and emergency services were

discussed in detail," Von Linden "has our emergency phone numbers," she is "aware of how to contact us if there are any problems or concerns as well as the Help Center and emergency resources," and she "readily agrees to utilize those." A nurse also went over the instructions with Von Linden and Mulhern. Dr. Jennisch discharged Von Linden from the hospital at 10:15 a.m., and she took those instructions home with her.

The next day, June 9, Von Linden returned to work and scheduled follow-up appointments with Dr. Jennisch for June 23 and the psychologist he recommended for July 2. On June 13, Von Linden called Dr. Jennisch's office and obtained permission to increase her medication.

Von Linden and Mulhern next met with Dr. Jennisch on June 23. Dr. Jennisch noted Von Linden was doing better and had tolerated her new medications without any difficulties. Von Linden reported that she had only seen small changes since her discharge from the hospital but had not had any suicidal thoughts. Mulhern reported that she seemed brighter and better able to laugh and enjoy things. Dr. Jennisch spent significant time discussing Von Linden's illness and making recommendations for her continued care. He discussed with her the option of returning to the hospital for the intensive outpatient treatment program, which she declined. Dr. Jennisch "again reviewed emergency services . . . as well as stress management techniques." He agreed to see her again in two weeks and instructed her to call him in the interim if she had any problems or concerns. Dr. Jennisch and plaintiff's expert at trial testified that, as of June 23, she could not be involuntarily committed under Iowa law. Von Linden scheduled another appointment to see Dr. Jennisch on July 7.

Meanwhile, Von Linden was attending work every day. Her supervisor testified at trial that the last day he saw her, June 27, she

was performing well at work and appeared to be "in a great mood." Her work calendar reflected she was planning future appointments. On June 29, Mulhern left to go play a slow-pitch softball game. Mulhern's daughter was playing at a neighbor's house. At approximately 12:15 p.m., while Mulhern was still gone, his son arrived at the house, let himself in, made something to eat, and watched TV while he waited for Mulhern to return. When Mulhern arrived back home, he asked his son where Von Linden was, and they both began to search for her. His son ran into the garage and found Von Linden. She had committed suicide by hanging herself from a pipe using a chain and a rope. There is no evidence or claim she called or attempted to use the emergency phone numbers after seeing Dr. Jennisch on June 23.

Mulhern, individually and on behalf of Von Linden's estate, filed a petition against Catholic Health Initiatives d/b/a Mercy Franklin Center, and/or Mercy Hospital and/or Mercy Psychiatric Services (Mercy), alleging that Mercy's negligence was a proximate cause of Von Linden's death. Mercy alleged as an affirmative defense that Von Linden's conduct, in whole or in part, proximately caused her death. Mercy's answer affirmatively stated, "[T]his action is governed by Chapter 668 of the Code of Iowa."

The case proceeded to trial. The evidence included conflicting expert testimony regarding whether the brevity of Von Linden's hospitalization and the quality of care she received while hospitalized contributed to her ultimate suicide. At the close of the evidence, the estate objected to the court instructing the jury that it could compare Von Linden's fault to the fault of Mercy. It also objected to the court giving a sole proximate cause instruction. The court overruled these

objections. Accordingly, on the verdict form, the jury was permitted to allocate a percentage of fault to Von Linden.

The estate also requested three jury instructions that the court declined to submit: an "eggshell plaintiff" instruction, a second instruction that would allow the jury to consider the result of treatment as evidence of negligence, and a third on the lost-chance-of-survival doctrine.

The estate did not name Dr. Jennisch as a defendant, but claimed Mercy was vicariously liable for his acts because he was Mercy's agent when he treated Von Linden. The court submitted a special interrogatory on this issue.

The jury found Mercy, Dr. Jennisch, and Von Linden negligent and their negligence proximately caused the estate's damages. It found that Von Linden's suicide was not the sole proximate cause of the estate's damages. The jury allocated ninety percent of the total fault to Von Linden and five percent each to Mercy and Dr. Jennisch. The jury found Dr. Jennisch to be Mercy's agent. The district court entered judgment in favor of Mercy because the jury found Von Linden's fault exceeded fifty percent of the total fault.

The estate moved for a new trial based on instructional errors. The district court overruled the motion, and the estate appeals.

**II. Issues.**

The estate raises five issues for our review. First, the estate argues the district court erred by instructing the jury it could compare the fault of Von Linden with the fault of Mercy. Second, the estate claims the district court erred by instructing on sole proximate cause. Third, the estate argues the district court erred in failing to submit its "result of treatment" instruction. Fourth, it contends the district court erred in

failing to give the jury an "eggshell plaintiff" instruction. Finally, it asserts the district court erred by failing to instruct the jury on the lost-chance-of-survival doctrine.

### III. Scope of Review.

We review a claim that the district court gave improper jury instructions for correction of errors at law. *Summy v. City of Des Moines*, 708 N.W.2d 333, 340 (Iowa 2006). We review the related claim that the district court should have given a party's requested instructions for an abuse of discretion. *Id.* "Error in giving or refusing to give a particular instruction does not warrant reversal unless the error is prejudicial to the party." *Herbst v. State*, 616 N.W.2d 582, 585 (Iowa 2000).

### IV. Comparative Fault.

The primary issue is whether the district court committed reversible error in submitting Mercy's defense of the comparative fault of Von Linden. The marshaling instruction (No. 16) for Mercy's comparative fault defense stated:

> The defendant claims the conduct of Elizabeth Von Linden in taking her own life was a proximate cause of plaintiff's damages. In order to establish this defense the defendant must prove all of the following propositions.
>
> 1. Elizabeth Von Linden was at fault in the taking of her own life.
>
> 2. The conduct of Elizabeth Von Linden was a proximate cause of plaintiff's damages.
>
> If the Defendant has failed to prove either of these propositions, the Defendant has not proved its defense. If the Defendant has proved both these propositions, then you will assign a percentage of fault against the Plaintiff and include the Plaintiff's fault in the total percentage of fault found by you in answering the special verdicts.

Instruction No. 8 stated, "Fault means one or more acts or omissions towards the person of the actor or of another which constitutes negligence." Instruction No. 9 stated:

> "Negligence" means failure to use ordinary care. Ordinary care is the care which a reasonably careful person would use under similar circumstances. "Negligence" is doing something a reasonably careful person would not do under similar circumstances, or failing to do something a reasonably careful person would do under similar circumstances.[1]

The estate objected to the instructions and submission as follows:

> Plaintiff objects to the giving of Instruction Nos. 16, 16A, 16B, and 17 dealing with proximate causation of plaintiff's damages being caused by the decedent Elizabeth Von Linden. In that — and the sole proximate cause in those instructions fail to take into consideration and fail — and should not be given because in this record the evidence is that this conduct of the defendant is the one that caused this to happen and that anything that Elizabeth Von Linden did thereafter is a result and cumulative upon the conduct of the defendant — of the defendant in this case. Therefore, it's inappropriate to be instructing the jury in connection with that or any kind of comparative fault concepts in this case.
>
> Furthermore, Your Honor, we object to the jury verdict form to the extent that the verdict form submits the issue of fault of Elizabeth Von Linden as being comparative or being a proximate cause and do not believe that there should be anything in Question No. 9 assessing fault to Elizabeth Von Linden.

The trial court overruled the estate's objection. The jury was informed, as required by Iowa Code section 668.3(5), that the estate would be barred from recovery if Von Linden was found more than fifty percent at fault. The jury ultimately found Von Linden ninety percent at fault, resulting in entry of judgment in Mercy's favor.

The estate's brief supporting its motion for new trial and its appellate briefing clarify the reasons it argues the district court erred in submitting Von Linden's comparative fault. First, the estate contends that suicide is an intentional act that cannot be compared under Iowa

---

[1]Mercy did not request submission of a specification of fault or instruction on Von Linden's recklessness, unreasonable assumption of risk, failure to avoid an injury, or to mitigate damages.

Code chapter 668 with Mercy's negligence. Second, relying on case law from other jurisdictions, the estate contends "there can be no comparative negligence where the defendant's duty of care includes preventing any self-abusive or self-destructive acts that cause the plaintiff's injury." Third, the estate argues Von Linden lacked the mental capacity to be found negligent or responsible for her actions at the time of her suicide. We address that issue first because, if the estate is correct, it would be unnecessary to decide the other challenges to the submission of Von Linden's fault.

**A. Did the Estate Establish Von Linden Lacked the Mental Capacity to Be Found Negligent?** The estate contends the district court erred in submitting Von Linden's comparative negligence because, at the time of her suicide, she lacked the mental capacity to be found negligent. Mercy contends the estate failed to preserve error on this "mental incapacity" argument that the estate raised for the first time in its motion for a new trial. The estate's general objection to the submission of comparative fault did not specifically urge that Von Linden lacked the mental capacity to be found negligent, nor did the estate request a jury instruction on her incapacity or diminished capacity. Although we have doubts whether error was preserved on this issue, we decide it on the merits.

Whether a person suffering from a mental disease lacks the capacity to be found negligent is generally a question of fact. *See Borchard v. Anderson*, 542 N.W.2d 247, 249 (Iowa 1996) ("The issue whether a person is mentally ill for purposes of the tolling statute is factual."); *cf. Mastland, Inc. v. Evans Furniture, Inc.*, 498 N.W.2d 682, 684–85 (Iowa 1993) (whether a child older than age three is capable of negligence is a factual determination). The estate argues the very fact of

Von Linden's suicide establishes her mental incapacity because a person who is a danger to herself can be involuntarily committed. Iowa R. Crim. P. 2.22(8)(*b*), (*e*). Her suicide alone, however, does not preclude a finding of comparative negligence, as the Illinois Supreme Court recognized in *Hobart v. Shin*:

> [P]eople generally have a duty to exercise ordinary care for their own safety. We are not prepared to hold . . . that this principle is inapplicable to all patients who commit suicide while under treatment for suicidal tendencies. Rather, we believe the better-reasoned approach is as another court has written on this subject:
>
> "[T]he issue of contributory negligence of a mentally disturbed person is a question of fact; unless, of course, the evidence discloses that the person whose actions are being judged is completely devoid of reason. If he is so mentally ill that he is incapable of being contributorily negligent, he would be entitled to have the jury so instructed . . . . But only in those cases in which the evidence would admit to no other rational conclusion would plaintiff be entitled to have the issue determined as a matter of law."

705 N.E.2d 907, 910–11 (Ill. 1998) (quoting *De Martini v. Alexander Sanitarium, Inc.*, 13 Cal. Rptr. 564, 567 (Ct. App. 1961) (citation omitted)).

We conclude the estate failed to establish that Von Linden was so mentally incapacitated she was incapable of being found negligent as a matter of law. At the time of her death, Von Linden was being treated as an outpatient and working at her executive-level job. Her suicide occurred three weeks after her discharge from the hospital and six days after her office visit with Dr. Jennisch. This scenario is unlike custodial cases involving the death or injury of an institutionalized patient incapable of self-care. *See Tomfohr v. Mayo Found.*, 450 N.W.2d 121, 125 (Minn. 1990) (holding on the facts of that case that the mentally ill patient admitted to locked hospital ward for suicidal ideations "lacked the capacity to be responsible for his own well being"). Plaintiff's own

expert testified that, at the time of her last visit with Dr. Jennisch on June 23, Von Linden was not a candidate for involuntary civil commitment. Indeed, her supervisor testified that on June 27, two days before her suicide, she was performing her job well. *See Borchard*, 542 N.W.2d at 249–50 (holding as a matter of law plaintiff failed to establish mental disability to toll statute of limitations while she was holding a job and raising children).

Other courts have recognized that juries should be instructed to consider the diminished mental capacity of the suicidal patient. *Maunz v. Perales*, 76 P.3d 1027, 1035 (Kan. 2003) (jury should consider mental capacity of suicide victim in evaluating comparative fault). We need not determine whether the estate would have been entitled to a jury instruction on Von Linden's diminished mental capacity, however, because the estate never requested such an instruction at trial. Accordingly, the estate is not entitled to a new trial on grounds of Von Linden's mental incapacity.

**B. Does Iowa Chapter 668 Allow a Comparative Fault Defense Based on an Act of Suicide?** The estate argues suicide is an intentional act that cannot be compared with Mercy's negligence because intentional torts were omitted from the definition of "fault" in Iowa Code section 668.1(*a*). Specifically, the estate argues in this appeal:

> As negligence and an intentional tort cannot be compared, a comparative fault instruction should not have been submitted in this case. Negligence is not a defense to an intentional tort. *Tratchel v. Essex Group, Inc.,* 452 N.W.2d 171, 180–81 (Iowa 1990). A suicide likewise is not an appropriate basis for an assessment of comparative fault to be compared with treating mental health professionals' deviation from the standard of care with regard to a plaintiff's mental health condition. In this medical negligence case, an intentional act of suicide is not a proper factual basis upon which to submit comparative fault.

The estate's objection to the submission of Von Linden's comparative fault at trial did not include this specific argument. Mercy's appellate brief, however, concedes error was preserved, so we will decide this question on the merits.

Whether Iowa Code chapter 668 allows mental health professionals to raise a comparative fault defense based on their patient's act of suicide is a question of first impression in Iowa. The answer is a matter of statutory interpretation.

The purpose of statutory interpretation is to determine the legislature's intent. *State v. McCoy*, 618 N.W.2d 324, 325 (Iowa 2000). "The first step in ascertaining the true intent of the legislature is to look at the statute's language." *Estate of Ryan v. Heritage Trails Assocs., Inc.*, 745 N.W.2d 724, 729 (Iowa 2008). When the statute's language is plain and unambiguous, we will look no further. *Id.* at 730. We determine the legislature's intent by the words the legislature chose, not by what it should or might have said. *State v. Wiederien*, 709 N.W.2d 538, 541 (Iowa 2006). We also consider the legislative history of a statute when ascertaining legislative intent. *State v. Allen*, 708 N.W.2d 361, 366 (Iowa 2006). We may not extend, enlarge, or otherwise change the meaning of a statute under the guise of construction. *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004). In construing our comparative fault act, "[w]e seek a reasonable construction that will accomplish the purpose of the legislation and avoid absurd results." *Hagen v. Texaco Ref. & Mktg., Inc.*, 526 N.W.2d 531, 542–43 (Iowa 1995).

We begin with a review of the history of chapter 668 to put the operative statutory language in context. At common law, a plaintiff's contributory negligence was a complete bar to recovery. *Goetzman v. Wichern*, 327 N.W.2d 742, 744 (Iowa 1982), *superseded by statute*, Iowa

Code ch. 668. In *Goetzman,* we replaced the common law bar with the doctrine of pure comparative negligence "under which an injured party's recovery is diminished in proportion to that party's contributory negligence, and recovery is not barred unless the injured party's negligence is the sole proximate cause of the damages." *Id.* The legislature responded the following year by enacting the Comparative Fault Act, Iowa Code chapter 668. 1984 Iowa Acts ch. 1293. We have noted "[b]y its terms, the purpose of the comparative fault act is to establish 'comparative fault as the basis for liability in relation to claims for damages arising from injury to or death of a person or harm to property.' " *Waterloo Sav. Bank v. Austin,* 494 N.W.2d 715, 717 (Iowa 1993) (quoting 1984 Iowa Acts ch. 1293). We have described the legislative intent underlying chapter 668 as follows:

> In general, the purpose of section 668.3 is to make defendants pay in proportion to their fault. Correspondingly, any reduction in a plaintiff's recovery represents a way of making the plaintiff "pay" for his or her proportional responsibility. In other words, section 668.3(1) prevents a plaintiff from being compensated for fault that he or she should fairly bear.

*Godbersen v. Miller,* 439 N.W.2d 206, 208 (Iowa 1989) (citation omitted).

Here, the estate seeks a full recovery from Mercy for Von Linden's self-harm, without any reduction for her own responsibility. We find no support for that outcome in the text, history, or purpose of chapter 668.

1. *Does suicide fall within the definition of fault in section 668.1(1)?* The fighting issue is whether Von Linden's suicide can be considered as fault under chapter 668. The legislature defined fault as

> *one or more acts or omissions that are in any measure negligent* or reckless toward the person or property of the actor or others, or that subject a person to strict tort liability. The term also includes breach of warranty, unreasonable assumption of risk not constituting an

enforceable express consent, misuse of a product for which the defendant otherwise would be liable, and unreasonable failure to avoid an injury or to mitigate damages.

Iowa Code § 668.1(1) (emphasis added).

Because Von Linden's fault was submitted under a negligence theory, we must decide whether her act of taking her own life is an "act[] or omission[] that [is] in any measure negligent" within the meaning of section 668.1(1). The Iowa legislature adopted the definition of fault verbatim from the Uniform Comparative Fault Act, section 1. The Uniform Act and its Iowa counterpart omit intentional torts from the definition of fault. The comment to the Uniform Act states the act does not apply "in a case in which the defendant intentionally inflicts the injury on the plaintiff." Unif. Comparative Fault Act § 1 cmt., 12 U.L.A. 125, 126 (2008). No comment addresses a plaintiff's intentional self-harm.

It is important to note that the jury was not asked to compare Mercy's negligence with an intentional *tort* by Von Linden, such as battery. Rather, Mercy based its defense on Von Linden's negligence. The estate is not permitted to change how Mercy framed its defense from one of negligence to an intentional tort in order to bar the defense. The estate argues Von Linden's suicide cannot be considered negligent because it is an intentional act. This argument rests on a false premise—that negligent conduct cannot include intentional self-harm. The district court correctly defined "negligence" in jury instruction No. 9:

> "Negligence" means failure to use ordinary care. Ordinary care is the care which a reasonably careful person would use under similar circumstances. "Negligence" is doing something a reasonably careful person would not do under similar circumstances, or failing to do something a reasonably careful person would do under similar circumstances.

Clearly, a reasonably careful person would not hang herself. We hold the act of suicide can be found "negligent" within the meaning of section 668.1(1). Support for our conclusion that negligence encompasses intentional conduct is found in the Restatement (Third) of Torts: Apportionment of Liability. "Plaintiff's negligence can include conduct that is reckless, grossly negligent, or intentional." Restatement (Third) of Torts: Apportionment of Liability § 3, cmt. *a*, at 29 (2000). The concept of negligence contemplates that every person must act as a reasonable person would have acted under the same or similar circumstances. *Id.* § 3, at 29. The same standard of care that applies to a defendant also applies to a plaintiff when assessing contributory negligence. *Id.* § 3, cmt. *a*, at 29–30. If a person acts with intent to cause harm, the person necessarily breaches a duty to act as a reasonable person. Accordingly, within the context of a claim for damages based on negligence, conduct by the plaintiff that was intended to cause self-harm constitutes an act that is "in any measure negligent . . . toward the . . . actor" because a person who intentionally causes harm also fails to act as a reasonable person. Iowa Code § 668.1(1).

The drafting history of chapter 668, based on the Uniform Comparative Fault Act, provides further support for our conclusion that the intentional nature of conduct does not preclude a comparative fault defense when "one or more acts or omissions" of the party "in any measure" fall within a form of fault expressly included in section 668.1(1). Suicide falls easily within the term "unreasonable assumption of risk" found in section 668.1(1). Our court has relied on the drafter's comments to the Uniform Act in construing the Iowa act. *See, e.g.*, *Baldwin v. City of Waterloo*, 372 N.W.2d 486, 493 (Iowa 1985). The drafters of the Uniform Act said this about assumption of risk:

> "Assumption of risk" is a term with a number of different meanings—only one of which is "fault" within the meaning of this Act. This is the case of unreasonable assumption of risk, which might be likened to deliberate contributory negligence and means that the conduct must have been voluntary and with knowledge of the danger.

Unif. Comparative Fault Act § 1 cmt., 12 U.L.A. 125, 126 (2008). The drafters thereby equate "assumption of risk" with "deliberate contributory negligence," encompassing voluntary conduct undertaken with knowledge of the danger.

The Washington Comparative Fault Act's definition of "fault" is identical to Iowa's. Wash. Rev. Code § 4.22.015 (2005). Yet despite the omission of intentional torts from that definition, in *Gregoire v. City of Oak Harbor*, five of nine justices on the Washington Supreme Court concluded a suicidal inmate's fault could be compared with his negligent jailer's, if on remand the jury did not find the jail assumed plaintiff's duty of self-care during his incarceration. 244 P.3d 924, 937 (Wash. 2010) (Madsen, C.J., concurring in part, dissenting in part) ("[A]bsent proof that the jail assumed Gregoire's duty of self-care, the trial court on remand should be free to consider whether to instruct the jury on comparative fault."); *id.* at 938 n.1 (Alexander, J., dissenting) (same). The four-justice plurality concluded that the jailer's special duty to an inmate precluded submission of comparative fault defenses, without attributing that result to the omission of intentional torts from the comparative fault act. *Id.* at 932.

Our conclusion that suicide may constitute negligence within the meaning of section 668.1(1) is supported by the majority of jurisdictions holding that, notwithstanding the intentional nature of the act of suicide, the jury is permitted to compare the negligence of the noncustodial suicide victim with the fault of the defendant medical professional

treating her. *See, e.g., Sheron v. Lutheran Med. Ctr.*, 18 P.3d 796, 801 (Colo. App. 2000) ("[W]e hold that a patient who is treated by health care providers for suicidal ideations, and who later commits suicide, may be found comparatively negligent or at fault . . . ."); *Brandvain*, 372 S.E.2d at 275 (holding comparative fault of suicidal patient was a question for the jury); *Hobart*, 705 N.E.2d at 911 (finding "the better-reasoned approach" is to allow physician to raise defense of the patient's negligence when mental capacity is a question of fact); *Maunz*, 76 P.3d at 1035 (holding trial court correctly submitted defense of comparative negligence in malpractice action against psychiatrist arising from suicide several days after discharge from hospital); *Champagne*, 513 N.W.2d at 79 ("Comparison of fault between a suicide victim and a defendant, who has a duty of medical care toward that victim, is generally for the trier of fact."). These jurisdictions compared the fault of the noncustodial suicidal patient regardless of whether the respective state law allows a comparative fault defense to intentional torts.[2]

The lone outlier is the Tennessee Supreme Court's decision in *White v. Lawrence,* 975 S.W.2d 525, 531–32 (Tenn. 1998) (physician's "liability may not be reduced by comparing his negligent conduct with

---

[2]The North Dakota Comparative Fault Act expressly includes "willful conduct" in its definition of fault. *Champagne*, 513 N.W.2d at 79 (" 'Fault' now includes an intentional act."). The other jurisdictions, like Iowa, hold that comparative negligence is not a defense to an intentional tort. *Slack v. Farmers Ins. Exch.*, 5 P.3d 280, 285 (Colo. 2000) (noting Colorado's "comparative negligence statute refers only to the negligence of the victim and the negligence of the tortfeasor"); *Terrell v. Hester*, 355 S.E.2d 97, 98 (Ga. Ct. App. 1987) (holding comparative fault instruction as to plaintiff's negligence was inappropriate where plaintiff was battered); *Mother Earth, Ltd. v. Strawberry Camel, Ltd.*, 390 N.E.2d 393, 405 (Ill. App. Ct. 1979) ("[I]t is well-settled that an action for an intentional tort cannot be defeated by an assertion of negligence on the part of the plaintiff."); *Lynn v. Taylor*, 642 P.2d 131, 135 (Kan. Ct. App. 1982) (noting there is "no authority for including an intentional tort such as fraud within the ambit of comparative fault principles"). Nevertheless, the courts in those jurisdictions allow juries to compare the fault of the noncustodial suicidal patient.

the decedent's intentional act of committing suicide"). *White* is the only noncustodial suicide case cited by the estate in support of the position the district court erred in submitting the comparative fault defense. In *White*, a depressive alcoholic shot himself four hours after leaving an emergency room. *Id.* at 527–28. A narrow majority of three justices relied exclusively on *custodial* cases to disallow a comparative fault defense based on harm the psychiatrist had a duty to prevent, concluding the "same principles" applied "with equal force" to the outpatient suicide. *Id.* at 531. The majority noted practical difficulties "allocating fault between negligent and intentional acts [that] are different in degree, in kind, and in society's view of the relative culpability of each act." *Id.*

Two justices dissented in part. Justice Drowata stated:

> I disagree, however, with the majority's conclusion that the decedent's intentional act of committing suicide may not be considered in determining relative degrees of fault. The majority's holding that the negligence of the defendant may not be compared with the intentional conduct of the decedent in taking his own life in assessing fault is inconsistent with the fundamental principle of comparative fault of linking liability with fault. Therefore, I respectfully dissent from the majority's decision.

*Id.* at 532 (Drowata, J., concurring in part, dissenting in part). Similarly, Justice Holder dissented to the extent the majority opinion is read to preclude a comparative negligence defense in an appropriate case, stating "[a] patient's negligent acts or omissions have always been available as a defense." *Id.* at 534 (Holder, J., concurring in part, dissenting in part).

The Kansas Supreme Court expressly declined to follow *White* for reasons we find persuasive. *See Maunz*, 76 P.3d at 1033. The *Maunz* court concluded *custodial* cases are "of dubious value" in adjudicating

comparative fault in an outpatient setting. *Id.* at 1032. The *Maunz* court aptly observed that, when a "known, actively suicidal patient is hospitalized, the hospital and health care providers assume the patient's duty of self-care." *Id.* By contrast, patients who are treated on an outpatient basis "generally have a duty to exercise ordinary care for their own safety." *Id.*

We find the *Maunz* court's approach to be a better fit with Iowa's law of comparative fault. The *Maunz* court recognized a comparative fault defense in a noncustodial suicide case in part because the "state legislature has statutorily established a policy of comparing the negligence of all persons involved in a civil wrong, in one trial, and awarding damages in tort based on comparative fault." *Id.*; *see also Sheron*, 18 P.3d at 801 (to withhold defense of patient's comparative negligence "would ignore the strong policy in Colorado of apportioning fault in tort actions"); *Hobart*, 705 N.E.2d at 910–11 (relying on Illinois comparative fault statute to conclude suicidal plaintiff owed duty of care for her own safety). Similarly, "Iowa's comparative fault statute expressly states that the fault of other parties is to be compared in cases of negligence, recklessness, and strict liability." *Jahn v. Hyundai Motor Co.*, 773 N.W.2d 550, 560 (Iowa 2009) (declining to find an exception to the application of comparative fault principles in product liability enhanced injury cases because "the legislature has not provided for such an exception").

We recognize policy arguments exist for creating an exception to the comparative fault approach when the defendant owed the plaintiff a duty to protect the plaintiff from harm. We declined to recognize an exception in *Jahn*, even though a similar policy argument supported denying the motor vehicle manufacturer in a crashworthiness case a

comparative fault defense based on the driver's negligence. A reasonable legislator could conclude that vehicle manufacturers must foresee and protect against collisions and that their incentive to build in safety should not be diluted by allowing jurors to compare the fault of careless drivers. Similarly, a reasonable legislator could conclude that mental health practitioners with a duty to prevent suicide should be denied a comparative fault defense when the patient kills herself. The legislature, however, created no such exceptions in the Iowa Comparative Fault Act, and it is not our prerogative to rewrite the statute to do so.

Accordingly, we construe chapter 668 to permit a comparative fault defense in a medical malpractice action arising from a noncustodial suicide.

2. *Does the* Tratchel *rule require a new trial?* In *Tratchel*, we held chapter 668 did not allow a comparative fault defense to an intentional tort claim of fraud. *Tratchel v. Essex Group, Inc.*, 452 N.W.2d 171, 180–81 (Iowa 1990), *abrogated on other grounds by Comes v. Microsoft Corp.*, 775 N.W.2d 302, 310 (Iowa 2009). The estate contends that the *Tratchel* rule precludes Mercy from raising a comparative fault defense to Von Linden's intentional act of suicide. *Tratchel* remains good law for the proposition that an intentional tortfeasor cannot reduce his liability by raising a defense of the victim's comparative negligence. *Tratchel*, however, does not support the result sought by the estate.

*Tratchel* arose from a liquid petroleum gas explosion. *Id.* at 173. Carl Tratchel purchased a gas furnace equipped with a gas control unit manufactured by Essex. *Id.* The gas was turned off for a period when the house was vacant. *Id.* Carl returned on a cold autumn day and lit a match to start the furnace, resulting in an explosion that badly burned

Carl and his mother. *Id.* The Tratchels sued multiple defendants; all but Essex settled. The case went to the jury as follows:

> At the close of the evidence, the trial court submitted special verdicts and interrogatories which incorporated plaintiffs' three theories of liability against Essex. Plaintiffs alleged Essex manufactured a defective gas control unit and sought recovery based on: (1) strict liability; (2) negligence; and (3) fraud due to the withholding of facts about known product defects which misled defendant's customers and ultimately the consumers. On the strict liability and negligence counts, the court submitted a special verdict allocating fault to Essex, Carl and the settling defendants. The jury returned verdicts in favor of the plaintiffs on all three theories of liability, allocating fifty percent of the fault to Essex, one percent to Carl and the remaining forty-nine percent to the settling defendants except Fisher Controls, which was found faultless.

*Id.* at 174. The district court entered judgment against Essex on the fraud theory for 100% of plaintiffs' damages without any reduction for the comparative fault of Carl or the settling defendants. *Id.* The district court allowed a *pro tanto* (dollar for dollar) setoff for the amounts recovered by the Tratchels from the settling defendants. We affirmed. *Id.* at 181. We noted that "the tort of fraud is not mentioned in chapter 668." *Id.* at 180. In holding the district court "correctly rejected the application of comparative fault to the fraud claim," we observed:

> Prior to the adoption of chapter 668, our case law held that negligence is not a defense to fraud or to an intentional tort. Had the legislature intended chapter 668 to cover fraud actions, it could have easily included fraud in section 668.1.

*Id.* at 180–81 (citations omitted).

*Tratchel* teaches that claims outside the scope of chapter 668 are governed by Iowa common law. For that reason, *Tratchel* allowed the nonsettling defendant, Essex, a complete setoff of the settlement amounts under the common law *pro tanto* rule instead of applying

chapter 668 to reduce plaintiffs' fraud recovery by the forty-nine percent of fault the jury attributed to the settling defendants. *Id.* at 181.

This "default to the common law" approach is also illustrated in *Carson v. Webb*, 486 N.W.2d 278, 280 (Iowa 1992), holding section 668.14, the statutory modification of the collateral source rule, did not apply to an action for assault and battery because intentional torts are not included in section 668.1(1)'s definition of fault. We concluded the district court erred in allowing evidence of medical insurance payments under that section because the common law collateral source rule governed in intentional tort cases. *Id.* In other words, if chapter 668 is inapplicable to a particular tort claim, the common law governs. This does not help the estate because Iowa common law allowed no recovery for intentional self-harm absent a special custodial relationship. *See Cutler v. Klass, Whicher & Mishne*, 473 N.W.2d 178, 182 (Iowa 1991) ("Traditionally suicide has been considered an intentional or intervening act for which the tortfeasor cannot be held responsible"—noting exception "where the decedent is confined in a hospital or jail.").

The drafters of the Uniform Act, and in turn the Iowa legislature, chose to refrain from giving intentional wrongdoers—who are 100% liable for their harm under common law—a break by allowing them to raise a statutory defense of their victim's negligence. *See Flood v. Southland Corp.*, 616 N.E.2d 1068, 1071–72 (Mass. 1993) (concluding intentional torts were omitted from that state's comparative fault act because a "contrary conclusion would result in [comparative negligence] reducing plaintiffs' recoveries in cases to which the concept of contributory fault had no common law application, an unlikely legislative intention"). This leaves the common law outcome intact—a party is fully responsible for intentional harm notwithstanding the opposing party's negligence. The

Iowa legislature is presumed to know the state of the law at the time of enactment. *Slager v. HWA Corp.*, 435 N.W.2d 349, 353–54 (Iowa 1989) (holding dram defendant not entitled to a comparative fault defense under chapter 668 because negligence was not a defense to the dram statute when the comparative fault act was enacted).

We find no comment or indication in the Uniform Act that the drafters intended the omission of intentional torts to allow a plaintiff a full recovery for her own intentional harm. This legislative choice—to withhold the benefits of the comparative fault act from intentional wrongdoers—is a far cry from the estate's position that a plaintiff committing an intentional act is to be exonerated from any accountability for the resulting self-harm in her action against a negligent defendant. The estate cites no Iowa case, nor have we found one, that bars a negligent defendant from raising a defense based on the plaintiff's own intentional act. The estate's argument would lead to a "heads I win, tails you lose" situation in which a defendant who commits an intentional tort could not raise the plaintiff's fault, but a plaintiff who commits an intentional tort could not have its own fault raised against it.

Significantly for present purposes, the Iowa legislature adopted a modified system of comparative fault under which a plaintiff found over fifty percent at fault was barred from recovery. Iowa Code § 668.3(1)(*b*). Chapter 668 legislatively overruled *Goetzman*'s "pure" comparative fault system under which a plaintiff found ninety percent at fault could still recover ten percent of his damages. The Iowa legislature thus made a conscious policy choice that a plaintiff whose negligence is found to exceed fifty percent of the total fault cannot recover any damages from a negligent defendant. We conclude that the same legislature did not

intend the same statute to require a negligent defendant to pay 100% of the damages a plaintiff intentionally inflicts.

We refrain from construing our comparative fault act to reach an absurd result. *Hagen*, 526 N.W.2d at 542–43. Under the estate's interpretation of the Act, a plaintiff who intentionally causes damage could recover in full, even though a merely negligent plaintiff found over fifty percent at fault would be barred from any recovery. This leads to absurd results. For example, a plaintiff who carelessly, but accidentally, sets her home ablaze would have her recovery against a negligent fire protection service barred or reduced by her own comparative fault; yet a homeowner who intentionally sets her dwelling ablaze could recover in full.

The estate's position is not supported by *Stevens v. Des Moines Independent Community School District*, 528 N.W.2d 117 (Iowa 1995). That case merely held the district court erred in submitting an all-or-nothing instruction on superseding cause in the plaintiff-student's negligence action against a school for failing to prevent a foreseeable assault by another student. *Id.* at 120–21. The case did not adjudicate or even discuss comparative fault, nor is chapter 668 even mentioned. The case law involving intentional acts of third parties is equally inapposite. Those cases are distinguishable because the comparative fault at issue here is the plaintiff's, not a nonparty or third-party tortfeasor blamed for intentionally causing the plaintiff's harm.

For the foregoing reasons, if suicide is outside the scope of chapter 668, the estate would not be entitled to a new trial because recovery for Von Linden's intentional self-harm is barred at common law. *Tratchel* does not require a new trial.

**C. Does the Treater's Duty to Prevent Suicide Preclude a Comparative Fault Defense Based on That Occurrence?** The estate contends Mercy was negligent in allowing Von Linden's premature discharge from her initial hospitalization and should not be permitted to raise a defense based on the very occurrence of the suicide it had a duty of care to prevent. Mercy, however, presented credible expert testimony Von Linden's discharge from the hospital on June 8 was medically appropriate. Von Linden remained an outpatient until her suicide on June 29. Experts for both sides agreed that, as of June 23, her last outpatient visit with Dr. Jennisch, Von Linden was not a candidate for involuntary civil commitment. To outward appearances, she was doing well and, indeed, was performing her executive-level job. Accordingly, this case is readily distinguishable from custodial suicide cases involving the death of an institutionalized patient or inmate.

Courts in other jurisdictions have withheld a comparative fault defense in *custodial* suicide cases because the hospital had assumed the patient's duty of self-care. *See, e.g., Tomfohr*, 450 N.W.2d at 125 (noting the patient "cannot be held responsible in whole or in part for the breach of the duty to exercise care for his own well-being because the hospital had already assumed that duty"). The *Tomfohr* court expressly limited its holding to the custodial setting:

> [W]e wish to stress that this ruling is limited to the type of factual situation presented by this case, to-wit, an attempted suicide committed by a mentally ill patient admitted to a locked hospital ward where the medical staff was aware of his suicidal ideations.

*Id.* As noted above, the overwhelming majority of cases involving *noncustodial* suicide have held that the outpatient owes a duty of self-

care. The North Dakota Supreme Court rejected the very argument made by the estate here:

> We are not persuaded by the Champagnes' argument that, when a patient's act of suicide is a foreseeable result of a medical provider's failure to treat reasonably to prevent the suicide, it is never appropriate to compare the victim's act of suicide with the medical provider's fault. Rather, if the evidence shows that the patient is incapable of being responsible for his own care and that the medical provider has undertaken the duty of care for the patient's well-being, there would be no allocation of fault to the patient. If the medical provider has taken on the duty of caring for a patient with a diminished capacity, and if the patient is capable of being responsible for his own care, allocation of fault is in order.

*Champagne*, 513 N.W.2d at 80 (citations omitted); *Maunz*, 76 P.3d at 1033–34 (same); *see also Sheron*, 18 P.3d at 801 (rejecting blanket rule disregarding suicidal patient's comparative fault because "such a rule would fail to account for the nearly limitless different factual scenarios involved in these cases, many of which could well involve some fault by the patient"); *Birkner v. Salt Lake County*, 771 P.2d 1053, 1060 (Utah 1989) (noting that mental impairments in emotional disorders come in infinite degrees and concluding that categorical rule that no patient seeking help for a mental or emotional disorder can be charged with negligence would be unrealistic and cause damage to the principle of comparative negligence).

We recognize a comparative fault defense to a medical malpractice action when the plaintiff fails to follow the doctor's instructions as to follow-up care. *See DeMoss v. Hamilton*, 644 N.W.2d 302, 306 (Iowa 2003) ("[A] patient's failure to cooperate with or follow reasonable directions for the treatment of an ailment may be relevant in the appropriate case" as evidence of comparative fault.). Von Linden was instructed when she was discharged from the hospital on June 8 to call

the Help Center or return for care if her condition worsened. When she met with Dr. Jennisch on June 23, he told her to call him if she had any problems or concerns in the interim before her next appointment in two weeks. She failed to call Dr. Jennisch or the Help Center or return for any further care over the next six days before her suicide on June 29. A reasonable jury could find Von Linden negligent in this regard. Indeed, this jury found Von Linden ninety percent at fault.

The estate did not object to the district court's submission of her comparative fault on grounds the jury instructions failed to specify acts or omissions of negligence apart from taking her own life. Rather, plaintiff's counsel simply objected

> to the verdict form to the extent that the verdict form submits the issue of fault for Elizabeth Von Linden as being comparative or as being a proximate cause and does not believe that there should be anything in question in No. 9 assessing any fault to Elizabeth Von Linden.

We encourage the bench and bar to include factual specifications that explicitly set forth the particular acts or omissions constituting negligence. *See Coker v. Abell-Howe Co.*, 491 N.W.2d 143, 151 (Iowa 1992) (stating the purpose of requiring jury to consider specifications of negligence is to limit the determination of factual questions to only those acts or omissions upon which a particular claim is based and to allow the court the opportunity to make a preliminary determination of the sufficiency of the evidence to generate a jury question). We also encourage trial counsel to be specific in objections to jury instructions to give the district court and opposing counsel the opportunity to correct the instructions before they are read to the jury. If the estate's counsel had challenged the comparative fault instruction on grounds of lack of specificity at the instruction conference, Mercy could have added factual

specifications of Von Linden's negligence, consistent with the evidence, including her failure to follow medical advice to call the Help Center or return for care if her condition worsened. The estate is not entitled to a new trial based on lack of specificity when it failed to object on that basis.

In any event, independent of any failure to follow medical advice, the jury could find Von Linden's ultimate act of suicide of itself breached her duty of ordinary care for her own safety. We conclude that Von Linden's comparative fault was a question of fact for the jury. The estate, in effect, seeks an adjudication that Von Linden was not comparatively negligent as a matter of law. "It is only in the plainest cases, in which reasonable minds could come to no other conclusion, that we decide a question of contributory negligence as a matter of law." *Peters v. Howser*, 419 N.W.2d 392, 394 (Iowa 1988) (citing Iowa R. App. P. 14(*f*)(10) (now Iowa R. App. P. 6.904(3)(*j*))).

We also agree with the conclusion of the Illinois Supreme Court in *Hobart* that a rule eliminating a comparative fault defense in noncustodial suicide cases would make bad public policy. The *Hobart* court aptly observed:

> The consequence of such a ruling would be that no health care provider would want to risk the liability exposure in treating such a patient and, thus, suicidal persons would be denied necessary treatment. Public policy cannot condone such a result.

705 N.E.2d at 911. Not only would the rule sought by the estate deter some doctors from treating suicidal patients, such a rule would also encourage other doctors to practice defensive medicine by lengthening a mental patient's hospitalization beyond what is medically necessary.

This would increase costs at a time of scarce resources for mental health care in our state.

### V. Other Issues Raised on Appeal.

**A. Sole Proximate Cause.** The estate claimed it was error for the district court to instruct the jury to decide whether the conduct of Von Linden in taking her own life was the sole proximate cause of the estate's damages. " 'Sole proximate cause means the *only* proximate cause.' " *Summy*, 708 N.W.2d at 342 (quoting *Johnson v. Interstate Power Co.*, 481 N.W.2d 310, 323 (Iowa 1992)). The concept of sole proximate cause is problematic at best in a medical malpractice action against a mental health professional treating a suicidal patient. The North Dakota Supreme Court stated, "[W]hen a patient's suicide is a foreseeable consequence of the medical provider's negligent care, the act of suicide cannot be deemed a superseding intervening cause." *Champagne*, 513 N.W.2d at 81 (allowing comparative fault defense). Similarly, our own cases have held juries should not be instructed on sole proximate cause or superseding cause based on the foreseeable negligence of third parties when the defendant owed a duty to protect plaintiff from such harm. *See, e.g., Summy*, 708 N.W.2d at 343 (nonparty golfer's errant shot that struck plaintiff in eye "cannot, as a matter of law, be the sole proximate cause of the plaintiff's injury" in negligence action against golf course owner for unsafe layout of tees); *Stevens*, 528 N.W.2d at 120–21 (reversible error to submit superseding cause instruction based on assault by nonparty in plaintiff student's negligent supervision action against school district).

In this case, the estate was not prejudiced by any error in submitting the sole proximate cause defense because the jury found Von Linden's conduct was not the sole proximate cause of the estate's

damages. Accordingly, the estate is not entitled to a new trial on this ground. *See Herbst*, 616 N.W.2d at 585 (reversal required only if instructional error is prejudicial).

**B. Result of Treatment Instruction.** The estate also claims the district court abused its discretion in failing to give an instruction allowing the jury to consider Von Linden's suicide as evidence of Mercy's negligence. The estate's proposed instruction stated:

> While the result of the treatment administered to Elizabeth Von Linden, by the Defendants is not in itself evidence of negligence, it is a circumstance which may be considered *by you* in determining whether the result was caused by Defendants' negligence.

(Emphasis added.) This instruction is substantially similar to the "result of treatment" instruction we disapproved in *Smith v. Koslow*, 757 N.W.2d 677 (Iowa 2008). The *Koslow* plaintiff's proposed instruction stated:

> While the result alone is not, by itself, evidence of negligence, yet the same may nevertheless be considered, together with other facts and circumstances disclosed by the evidence in a given case in determining whether or not such result is attributable to negligence or want of skill.

*Id.* at 679. We held the district court properly rejected this instruction as an incorrect rule of law for a medical malpractice action requiring expert testimony, stating:

> Smith did not seek an additional instruction that would have informed the jury that a bad result could be considered by an expert witness in formulating his or her opinion. Instead, she sought an instruction that would permit the *jury* to do so in a case that required expert testimony. Under Iowa law, a court must give a requested instruction when it states a correct rule of law applicable to the facts of the case and is not embodied in other instructions. Under the circumstances of this case, the district court did not abuse its discretion in refusing to give the requested instruction because the instruction was not applicable to the facts of this case.

*Id.* at 682–83 (citation omitted).

Expert testimony was required in this case to generate a jury question as to Mercy's negligence. *See, e.g., Donovan v. State*, 445 N.W.2d 763, 766 (Iowa 1989) (stating "highly technical questions of diagnoses and causation which lie beyond the understanding of a layperson require introduction of expert testimony"); *Wilkins v. Lamoille County Mental Health Servs., Inc.*, 889 A.2d 245, 252–53 (Vt. 2005) (Expert testimony is required to generate a jury question in a medical malpractice action for suicide because the claims "all involve complex psychiatric/medical issues relating to the causes, warning signs, and prevention of suicide. These are plainly not issues within a lay juror's common knowledge and experience.").

We decline to overrule *Koslow*, which is controlling here. The estate's "result of treatment" instruction contains the same flaw identified in *Koslow*—the instruction permitted the *jury*, rather than the expert, to consider the outcome as evidence of medical negligence. The instructions given by the district court correctly set forth the elements of proof for the estate's medical malpractice claims. Accordingly, we hold the district court did not abuse its discretion in declining to give the "result of treatment" language requested by the estate.

**C. The Estate's Requested Instruction on Damages Theories.** Because we affirm the district court's judgment in favor of Mercy on liability, we do not reach the remaining issues as to whether the district court correctly refused to give the estate's requested jury instructions on the "eggshell plaintiff" theory or the "lost chance of survival" doctrine.

**VI. Summary and Disposition.**

We conclude the district court correctly submitted the issue of Von Linden's comparative fault and did not abuse its discretion in declining to give the estate's "result of treatment" instruction. We affirm

the judgment in favor of Mercy based on the jury verdict finding her ninety percent at fault.

**AFFIRMED.**

All justices concur except Wiggins and Appel, JJ., who dissent separately, and Hecht, J., who joins both dissents.

**WIGGINS, Justice (dissenting).**

I dissent. The majority attempts to reach what it deems a fair result in deciding the case by misconstruing chapter 668 of the Iowa Code. The majority then uses a fallback position that was not tried below or raised on appeal to affirm the judgment. At its best, the majority decision is wrong; at its worst, it usurps the power of the legislature by redefining the legislative policy of chapter 668.

It is well-settled law that our court will not review a case on a theory different from that on which the parties tried the case in the district court. *Dormoy v. Knower*, 55 Iowa 722, 724, 8 N.W. 670, 671 (1881). The parties tried this case as a comparative fault case governed by Iowa Code chapter 668. Furthermore, the defendants only requested an instruction asking the jury to find the estate at fault because "Elizabeth Von Linden was at fault for taking her own life." Moreover, these are the only theories the parties argue on appeal. Thus, these are the only issues we can decide in this appeal.

Iowa adopted its comparative fault act, chapter 668, in 1984. 1984 Iowa Acts ch. 1293. The explanation to the bill states, "This bill would enact the Uniform Comparative Fault Act as promulgated by the conference of commissioners on uniform state laws." H.F. 2487, Explanation, 70th G.A., Reg. Sess. (Iowa 1984). Explanations attached to bills are evidence of legislative intent. *City of Cedar Rapids v. James Props., Inc.*, 701 N.W.2d 673, 677 (Iowa 2005). This explanation makes it clear the legislature intended to follow the Uniform Comparative Fault Act.

The Uniform Comparative Fault Act contains the same definitions of fault as appears in Iowa Code section 668.1. Uniform Comparative

Fault Act § 1(b), 12 U.L.A. 125 (2008). The Uniform Comparative Fault Act states, "The Act does not include intentional torts." *Id.* § 1, cmt. at 126. While some states have included intentional acts within the definition of fault, Iowa chose not to do so. *Compare* Ind. Code § 34-6-2-45 (2008), *with* Iowa Code § 668.1 (2003). Therefore, the first question we need to answer is whether chapter 668 covers defendants' specification of negligence.

The court submitted one specification of comparative fault stating, "Elizabeth Von Linden was at fault in the taking of her own life." The estate argues under the facts of this case, suicide is not comparable to Mercy's negligence under Iowa Code section 668.1. Chapter 668 of the Code controls Iowa's comparative fault scheme. For purposes of chapter 668, the legislature defined fault as:

> one or more acts or omissions that are in any measure negligent or reckless toward the person or property of the actor or others, or that subject a person to strict tort liability. The term also includes breach of warranty, unreasonable assumption of risk not constituting an enforceable express consent, misuse of a product for which the defendant otherwise would be liable, and unreasonable failure to avoid an injury or to mitigate damages.

Iowa Code § 668.1(1).

The language we need to focus on is "one or more acts or omissions that are in any measure negligent or reckless toward the person or property of the actor or others." *Id.* The common meaning of suicide is "the act or an instance of taking one's own life voluntarily and intentionally." *Webster's Third New International Dictionary* 2286 (unabr. ed. 2002); *see also* Iowa Code § 707A.1 (defining suicide for the purpose of the assisted suicide statute as "the act or instance of taking a person's own life voluntarily and intentionally"). By definition, suicide is an intentional act. The act of committing suicide is neither negligent nor

reckless. Accordingly, suicide is not an act included in the definition of fault in chapter 668.

We have previously held, when an act of a party is not included in the definition of fault contained in the comparative fault statute, the comparative fault statute does not apply to the excluded conduct. *See, e.g.*, *Carson v. Webb*, 486 N.W.2d 278, 280 (Iowa 1992); *Tratchel v. Essex Group, Inc.*, 452 N.W.2d 171, 180–81 (Iowa 1990), *abrogated on other grounds by Comes v. Microsoft Corp.*, 775 N.W.2d 302, 310 (Iowa 2009); *Slager v. HWA Corp.*, 435 N.W.2d 349, 352–53 (Iowa 1989). In *Carson*, we held an intentional act, such as assault and battery, is not included in the definition of fault; therefore, the collateral source rule contained in section 668.14 was not applicable to the plaintiff's claim. 486 N.W.2d at 280. In *Trachtel*, we decided fraud is not included in the definition of fault contained in section 668.1(1). 452 N.W.2d at 180–81. Accordingly, we did not allow the jury to compare the negligence of one party with the fraud of another. *Id.* In *Slager*, we refused to allow the finder of fact to compare a corporation's dramshop liability with a patron's negligence because dramshop liability is not fault as defined by the legislature in section 668.1(1). 435 N.W.2d at 352–54.

To be consistent with our prior case law, we should not apply the provisions of chapter 668 to acts not included in the definition of fault found in section 668.1(1). Because suicide is not an act included in the definition of fault, the defendants were not entitled to compare the intentional act of Von Linden committing suicide to its negligence. Thus, I would find the court erred in instructing the jury that it must assign a percentage of fault against Von Linden if it concluded Von Linden was at fault for taking her own life.

The majority also relies on the rule of statutory construction directing the court to avoid construing a statute in a manner leading to an absurd result. The majority's reliance on this rule of construction is flawed in a number of ways. First, before we can rely on the rule, we must find the statute is ambiguous. *Andover Volunteer Fire Dep't v. Grinnell Mut. Reins. Co.*, 787 N.W.2d 75, 81 (Iowa 2010). If the statute is not ambiguous, we must apply it as written. *Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Shell Oil Co.*, 606 N.W.2d 376, 379 (Iowa 2000). The majority finds no ambiguity in the statute, which on its face clearly does not apply to intentional acts.

The second flaw in the majority's argument is the use of its example stating, "a plaintiff who carelessly, but accidentally, sets her home ablaze would have her recovery against negligent firefighters barred or reduced by her own comparative fault; yet a homeowner who intentionally sets her dwelling ablaze could recover in full." Comparing the act of a person committing suicide to the act of a person intentionally setting a fire is illogical. The person who set the fire is not under the care of the fire department to prevent that person from setting the fire. In this case, the jury found that Von Linden was under the care of the physician to treat a mental illness that made her more susceptible to commit suicide, and the physician was negligent in treating her.

A plain reading of the statute does not allow the majority to conclude the jury can compare an intentional act to a negligent act when it determines fault. For this reason, I disagree with the majority's analysis.

As a fallback position, the majority retries the case and finds that the jury could find Von Linden negligent for her failure to call the suicide hotline or the doctor's office before she committed suicide. The problem

with this position is that the parties did not try the case under this theory or raise this argument on appeal. I agree our statute allows the submission of comparative fault when there is evidence a suicide victim's negligence or "fault" contributed to the person taking his or her own life. *See, e.g., Sheron v. Lutheran Med. Ctr.*, 18 P.3d 796, 801 (Colo. App. 2000) (allowing suicide victim to be found comparatively negligent when there was evidence he was not completely truthful or forthcoming in his statements to medical care providers and when he failed to keep a follow-up mental health appointment). The flaw in the majority's argument is that the parties never tried the issue involving Von Linden's negligence in failing to call the suicide hotline or the doctor before committing suicide. In fact, the parties did not argue on appeal whether such conduct on the part of Von Linden constituted fault.

I agree there was evidence in the record regarding the existence of a suicide hotline and evidence that Von Linden's doctor instructed her to call the doctor's office if she had any problems. However, there was no evidence at trial that she failed to call the suicide hotline or the doctor's office after her discharge from the hospital. Additionally, the defendant did not introduce any evidence that the failure to call the suicide hotline or the doctor's office before she committed suicide was within the scope of the defendant's liability. The failure of the defendant to introduce this evidence and ask for a specific instruction to find Von Linden was negligent for failing to call the suicide hotline or the doctor's office makes it clear to me that this issue was not tried in the district court. In effect, the majority has stated that the mere fact that the evidence contained a reference to the suicide hotline or that she was told to call the doctor's office if she had any problems was enough for the jury to find that she was at fault. I disagree.

For the defendants to succeed on appeal with this argument, they would first have had to ask for a jury instruction claiming this specification of fault. The only specification of fault requested by the defendant was "Elizabeth Von Linden was at fault in the taking of her own life." This court should not decide this case on a theory that was not tried in the district court. *Dormoy*, 55 Iowa at 724, 8 N.W. at 671. The defendants offered no evidence tending to show that Von Linden's actions in not making a call for help had anything to do with her suicide. In the recent opinion of *Doe v. Central Iowa Health System*, 766 N.W.2d 787 (Iowa 2009), we held expert testimony must be produced to engender a fact question on the issue of whether conduct caused emotional harm. *Doe*, 766 N.W.2d at 794.

By using Von Linden's conduct on a theory of fault not presented to the jury to reach a fair result, the majority would allow the jury to speculate whether a failure to call, if such a failure in fact occurred, was a proximate cause of Von Linden's suicide. Had Von Linden's attorney known this might become a viable issue in this case, he could have objected to its submission to the jury for lack of evidentiary support. By using a theory that was not submitted to the jury as a justification of the outcome, the majority allows trial by ambush.

The bottom line is that, if a physician is negligent in the treatment of a patient, the physician is responsible for the damages within the scope of the physician's liability. It is clear to me that the majority believes it would be absurd and unfair to allow the estate of one who commits suicide to recover damages from medical providers. But a judge's personal opinion as to whether a person who commits suicide should or should not recover damages does not give the judge license to rewrite the comparative fault statute to achieve a desired result.

Our job as judges is not to write a decision to avoid an unfair result. Our job is to apply the law passed by the legislature. The legislature makes the policy of this state and decides what is fair or not fair. In the absence of ambiguity, our duty is to apply a statute as written so long as it is constitutional. The legislature made a policy decision not to include intentional acts in the definition of fault. I cannot join in the majority's recasting of the statute to achieve what it deems a fair result because to do so would usurp the power of the legislature.

Accordingly, I would reverse the judgment of the district court.

Hecht, J., joins this dissent.

**APPEL, Justice (dissenting).**

I respectfully dissent.

The majority opinion primarily rests on two legal conclusions. First, the majority opinion holds that, under Iowa Code chapter 668, a plaintiff's intentional misconduct in committing suicide may be compared against the negligence of a defendant in a case in which the defendant has a duty to act reasonably to prevent the plaintiff from self-harm. Second, the majority concludes in the alternative that the defendant, in any event, raised the issue of negligence and presented sufficient evidence of negligence to support the verdict under Iowa Code chapter 668.

In my view, both holdings are incorrect.

**I. Applicability of Comparative Fault Act to Intentional Misconduct.**

Iowa Code chapter 668 provides legislative codification of comparative fault principles. The chapter followed this court's decision in *Goetzman v. Wichern,* 327 N.W.2d 742, 754 (Iowa 1982), *superseded by statute,* Iowa Code ch. 668, in which the court, as a matter of common law, abandoned contributory negligence in favor of comparative fault principles.

A significant issue in any statutory scheme of comparative fault is whether the intentional acts of parties may be compared against negligent acts of parties. At least six states have concluded that intentional misconduct should be so compared. Specifically, Alaska law provides that fault includes "acts or omissions that are in any measure negligent, reckless, *or intentional*"; Idaho law broadly provides for allocation of "negligence *or comparative responsibility*"; Indiana law states

that fault "means an act or omission that is negligent, willful, wanton, reckless, *or intentional*"; Michigan law reads that fault includes "an act, an omission, conduct, including intentional conduct"; New York law provides for comparison of "culpable conduct"; and North Dakota law allows allocation for "willful conduct." *See* Alaska Stat. Ann. § 09.17.900 (2010) (emphasis added); Idaho Code Ann. § 6-803(3) (2010) (emphasis added); Ind. Code Ann. § 34-6-2-45 (2008) (emphasis added); Mich. Comp. Laws Ann. § 600.6304 (2000); N.Y. C.P.L.R. § 1411 (McKinney 1997); N.D. Cent. Code Ann. § 32-03.2-02 (2010).

Unlike these states, the Iowa legislature made a different choice on the question of intentional acts and omissions. Specifically, Iowa Code section 668.1 defines fault as "one or more acts or omissions that are in any measure negligent or reckless toward the person or property of the actor or others, or that subject a person to strict tort liability. . . ." Iowa Code § 668.1(1). Remarkably, the definition of fault in Iowa law does not include intentional misconduct or any broad phrase that might reasonably be construed to include it. *See id.*

The majority opinion thus lacks textual support. In defining "fault," the legislature provided a laundry list of items to be included or considered in the comparative process. *See id.* The legislature included "negligence," "recklessness," and acts or omissions giving rise to "strict liability," among other things. *Id.* The legislature did not include "intentional misconduct." *Id.*

Ordinarily, when the legislature supplies a list, we do not expand upon the list through creative interpretation. *Marcus v. Young*, 538 N.W.2d 285, 289 (Iowa 1995); *State v. Flack*, 251 Iowa 529, 533, 101 N.W.2d 535, 538 (1960). We ordinarily construe a statute based upon the language chosen by the legislature, not based on what it should have

said or might have said. *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004); *Painters & Allied Trades Local Union v. City of Des Moines*, 451 N.W.2d 825, 826 (Iowa 1990).

Further, the statute does not use open-textured terms that require judicial development. Negligence, recklessness, strict liability, and all the rest of the words and phrases in the legislature's definition of "fault" are well defined and do not include within their scope intentional acts. *See Farmer's State Bank of Darwin v. Swisher*, 631 N.W.2d 796, 801 (Minn. 2001) (holding language similar to Iowa statute does not include intentional acts or omissions); *Welch v. Southland Corp.*, 952 P.2d 162, 164–65 (Wash. 1998) (stating the phrase "acts or omissions . . . that are in any measure *negligent* or *reckless*" is not ambiguous under comparative fault statute).

The majority opinion lacks historical support. It cites nothing in the legislative history of the Iowa Comparative Fault Act to support its position. My independent research has not uncovered any historical materials supporting the majority opinion.

The majority does not offer a convincing structural argument to support its interpretation. Specifically, the Iowa Comparative Fault Act can easily be interpreted, consistent with the statutory language, as not allowing the comparison of intentional misconduct with negligent misconduct. Indeed, it is perfectly sensible to limit the scope of the Iowa Comparative Fault Act to cases involving "fault" as defined by Iowa Code section 668.1 and allow the common law to deal with the cases involving parties who do not have "fault" as defined in that section. Indeed, many courts seem to have come to this conclusion, at least with respect to intentional misconduct of potential defendants. *See, e.g., Hennis v. City Tropics Bistro, Inc.,* 1 So. 3d 1152, 1154–57 (Fla. Dist. Ct. App. 2009);

*Brandon ex rel. Estate of Brandon v. Cnty. of Richardson*, 624 N.W.2d 604, 619–20 (Neb. 2001); *Welch*, 952 P.2d at 165.

The majority does not have doctrinal support in our case law. Indeed, the case law runs in the opposite direction. We have held, for instance, that intentional misconduct of third parties cannot be compared against negligent defendants. *See, e.g., Freeman v. Ernst & Young*, 516 N.W.2d 835, 837 (Iowa 1994); *see also Tratchel v. Essex Group, Inc.*, 452 N.W.2d 171, 180–81 (Iowa 1990), *abrogated on other grounds by Comes v. Microsoft Corp.*, 775 N.W.2d 302, 310 (Iowa 2009). It would be odd to suggest that intentional misconduct of defendants cannot be compared, while the intentional misconduct of the plaintiff may.[3] Indeed, the fact that intentional misconduct of third parties could not be compared by a negligent party under Tennessee law was a significant factor that led to the decision in *White v. Lawrence*, 975 S.W.2d 525 (Tenn. 1998).

The majority seizes upon the fact that, in this case, the plaintiff was receiving outpatient rather than inpatient care. It is suggested that,

---

[3]Under the majority approach, a psychiatrist may be liable to a nurse who is assaulted by his patient without being able to compare the intentional acts of the patient. It lacks symmetry to suggest that when the actor is a plaintiff, the intentional acts may be compared against other parties, but not when the intentional tortfeasor is a defendant. There either is a duty to protect against intentional misconduct or there is not.

This logic is recognized in the case law. For instance, in Tennessee, the supreme court in *Turner v. Jordan*, 957 S.W.2d 815, 823 (Tenn. 1997), held that the intentional acts of a psychiatrist's patient could not be compared to the negligence of a psychiatrist in a medical malpractice action arising from an assault by the patient on the plaintiff. This case was a driving force in *White v. Lawrence*, 975 S.W.2d 525, 531 (Tenn. 1998), which held that the decedent's intentional act of a suicide could not be compared against the negligence of the decedent's treating physician in a medical malpractice action.

Similarly, in Iowa, we concluded in *Freeman* that the intentional act of a third party could not be compared against the negligence of the defendant. *See Freeman*, 516 N.W.2d at 837. As in Tennessee, the *Freeman* case provides a strong impetus in this case.

with the exception of *White*, the cases involving tort liability in suicide cases against physicians and hospitals arise out of custodial settings. *See, e.g., McNamara v. Honeyman*, 546 N.E.2d 139, 146–47 (Mass. 1989); *Cowan v. Doering*, 545 A.2d 159, 160 (N.J. Super. Ct. App. Div. 1988). The distinction between custodial and noncustodial care, however, has no relevance to the meaning of "fault" in the language contained in Iowa Code section 668.1. Instead, the distinction between custodial and noncustodial care could be an important factor in determining whether a defendant had a duty or breached a duty of care toward a patient. *King v. Smith*, 539 So. 2d 262, 264 (Ala. 1989) (holding psychiatrist had no duty of care in light of the outpatient character of the relationship between the psychiatrist and his patient); *Bellah v. Greenson*, 146 Cal. Rptr. 535, 538 (Ct. App. 1978) (observing that the duty imposed on those responsible for the care of a patient in an institutional setting differs from the duty imposed in a case involving an outpatient); *Estate of Haar v. Ulwelling*, 154 P.3d 67, 72–73 (N.M. Ct. App. 2007) (finding no duty between psychiatrist and patient based on lack of sufficient control of patient); *see generally* Charles J. Williams, *Fault and the Suicide Victim: When Third Parties Assume a Suicide Victim's Duty of Self-Care*, 76 Neb. L. Rev. 301, 310–11 (1997) (discussing custodial/noncustodial distinction as one of duty). These duty issues, however, are not raised in this appeal.[4] Further, whether the patient was receiving outpatient or

---

[4]The majority also seems to imply that the suicide amounts to an intervening or superseding cause that would defeat liability of health care providers. *See Jain v. State*, 617 N.W.2d 293, 300 (Iowa 2000). But the intervening-cause rationale makes no sense in cases where there is a special relationship to prevent the very harm that was incurred. *See id.*; *see also Edwards v. Tardif*, 692 A.2d 1266, 1269–70 (Conn. 1997). Moreover, as with duty issues, the intervening/superseding cause issue has nothing to do with the statutory interpretation question before the court.

inpatient care has nothing whatsoever to do with whether Iowa Code section 668.1 includes intentional misconduct within its scope.

In short, the majority appears to be adding a complex sentence to the definition of "fault" in Iowa Code section 668.1. That additional sentence is: "By the way, the term 'negligence' includes intentional misconduct of a plaintiff, which may be compared against the negligence of a defendant, but the intentional misconduct of a third-party defendant may not be compared against other culpable parties."

How is it that the majority adds this additional sentence without substantial support in the statutory text, in the legislative history, in structural imperatives, or in existing doctrine? The result is driven by public policy. Judicial perception of public policy, while often crucial in common law development, does not give this court license to redraft the statute.

Further, there are plausible public policy arguments contrary to those asserted by the majority. It could be argued, for instance, that in cases of suicide, a hospital or physician should not be allowed to compare the plaintiff's intentional act of suicide because that is the very act that the health care professionals have a duty to prevent. *See McNamara*, 546 N.E.2d at 146 ("We join a number of courts in holding there can be no comparative negligence where the defendant's duty of care includes preventing the self-abusive or self-destructive acts that caused the plaintiff's injuries."); *Cowan*, 545 A.2d at 164–65 ("[T]he acts which plaintiff's mental illness allegedly caused him to commit were the very acts which defendants had a duty to prevent, and these same acts, cannot as a matter of law, constitute contributory negligence."); *see also Kan. State Bank & Trust Co. v. Specialized Transp. Servs., Inc.*, 819 P.2d 587, 606 (Kan. 1991) ("Negligent tortfeasors should not be allowed to

reduce their fault by the intentional fault of another that they had a duty to prevent."); *Veazey v. Elmwood Plantation Assocs., Ltd.*, 650 So. 2d 712, 719 (La. 1994) (same); Lisa A. Mecklenberg, Case Comment, *Negligence— Mental Health:  Why Is It My Fault When I'm the One Who's Dead?  North Dakota Comparative Fault in a Suicide Victim/Caregiver Context*, 71 N.D. L. Rev. 1105, 1122 (1995) (suggesting no fault should be assigned to a person who commits suicide in an action against one who failed to help her); Allen C. Schlinsog, Jr., Comment, *The Suicidal Decedent: Culpable Wrongdoer, or Wrongfully Deceased?*, 24 J. Marshall L. Rev. 463, 477–89 (1991) (asserting that modern psychiatry repudiates the notion of culpability in suicide cases and that the test of liability for caregivers is whether breach of duty was a substantial factor in bringing about death); Victor E. Schwartz, *Civil Liability for Causing Suicide:  A Synthesis of Law and Psychiatry*, 24 Vand. L. Rev. 217, 255 (1971) (declaring "person who commits suicide is not a blameworthy person and should not be regarded as such").  Similarly, a leading treatise declares that "[t]here can be no comparative negligence on the part of a patient who commits suicide where the psychiatric staff's duties include preventing the self-destructive act that causes the patient's death."  Richard M. Patterson, Harney's *Medical Malpractice*, § 10.3, at 285 (4th ed. 1999).

By citing these cases and authorities, I do not mean to suggest that the best or only approach is to disallow comparison of the intentional acts of a plaintiff who commits suicide.  These cases and authorities merely demonstrate that applying the plain language of Iowa Code section 668.1 to preclude the comparison of the plaintiff's intentional acts against the negligence of a health care provider who had a duty to protect the plaintiff from self-harm has a plausible policy footing and is not absurd or irrational.

The approach utilized by the majority is inconsistent with cases in which we decline to allow judicial perceptions of public policy to override the terms or structure of statutes. For instance, in *Jahn v. Hyundai Motor Co.*, 773 N.W.2d 550, 560 (Iowa 2009), we held that comparative fault principles would apply in crashworthiness cases under the language of Iowa Code chapter 668, even though there were policy reasons that could support another result. Similarly, in *Andover Volunteer Fire Department v. Grinnell Mutual Reinsurance Co.*, 787 N.W.2d 75, 87 (Iowa 2010), we concluded that, under the language of the statute, a volunteer firefighter must be called to duty by a third party authorized by the fire chief to be covered by workers' compensation notwithstanding policy arguments to the contrary. We should not employ inconsistent approaches to statutory interpretation.

## II. Negligence.

As a backup to its theory that the phraseology that "fault includes intentional misconduct by a plaintiff but not by a third-party defendant," the majority suggests in the alternative that, because there was adequate evidence the plaintiff was negligent, negligent acts of the plaintiff may be compared.

The problem with this theory is that, upon my review of the record, it is apparent that the issue of negligence was not joined in this trial. Indeed, remarkably, the only specification of negligence in this trial made against the plaintiff was "the act of suicide." That is it. In this case, it seems clear that the act of suicide was an intentional act. *Sampson v. Ladies of Maccabees of the World*, 131 N.W. 1022, 1024 (Neb. 1911) (noting that suicide is an intentional act); *Falkenstein v. City of Bismarck*, 268 N.W.2d 787, 790 (N.D. 1978) (same), *abrogated on other grounds by Minto Grain, LLC v. Tibert*, 776 N.W.2d 549, 555 (N.D. 2009).

Further, on appeal, the defendant in its appellate brief notes that the plaintiff "complied with all instructions." This admission demonstrates that the defendants did not put in issue the behavior of the decedent prior to the "act of suicide" itself.

The majority trumps these limitations and admissions of the defense—powerful aspects of the record—by suggesting that there was evidence that leaked into the record when a mass of medical records was introduced that might support a negligence theory. That may be barely true, but should be inconsequential in light of the fact that the issue was not joined by the parties. If the plaintiff had been aware that there were specifications of negligence other than "the act of suicide," a different record may have been developed by the defendant. We cannot decide this case on an issue that was not raised below and about which a much different record may have been developed had the issue been joined. The days of trial by ambush passed long ago, and I would not resurrect them here.

The majority's reaching out on this issue, like its interpretation of the statute, is driven by policy considerations. But it is also inconsistent with recent case law. In *Feld v. Borkowski*, 790 N.W.2d 72, 78 & n.4 (Iowa 2010), the majority of this court adopted a conservative approach to issue preservation in order to prevent consideration of an issue that may have led to abandonment of an antiquated special tort rule that restricted liability. Specifically, in *Feld*, the majority stated:

> [I]n the absence of the most cogent circumstances, we do not create issues or unnecessarily overturn existing law sua sponte when the parties have not advocated for such a change. . . . [W]e are restrained to apply the controlling law as advocated by the parties . . . .

*Feld*, 790 N.W.2d at 78 n.4.

Here, the majority takes a different approach. The parties litigated the case as involving the question of whether "the act of suicide" may give rise to some kind of fault to be compared to the negligence of medical professionals. On appeal, the majority broadens the issue, even though such broadening has not been advocated by the parties. The situation, however, is aggravated because had the parties at trial known that broader issues of negligence were at issue, a different factual record might have been developed.

### III.  Problem of Intentional Misconduct at Common Law.

It is possible, perhaps, that the claim brought by the plaintiffs in this case, because of the intentional acts, could be considered outside the parameters of Iowa Code chapter 668 and, instead, within the purview of common law. The problem with a common law approach to this case, however, is that the parties did not try this as a common law case. The fighting issue at the district court was over the meaning of fault under Iowa Code section 668.1. No one suggested that chapter 668 did not apply to this case.

There may have been some good reasons why the parties accepted the framework of Iowa Code chapter 668. They may have, of course, simply concluded that it applied. Or, there may have been strategic considerations. Iowa Code chapter 668 was not all bad news for the defendants. Iowa Code chapter 668 is a modified comparative fault statute. Under the legislature's scheme of comparative fault, a plaintiff found more than fifty percent at fault is barred from recovery, whereas at common law there is no such bar. *See Goetzman,* 327 N.W.2d at 753 (adopting pure comparative negligence). The defendants thus could have made a strategic choice to try the matter under Iowa Code chapter 668 and gain the benefit of modified comparative fault rather than take their

chances at common law. Conversely, the plaintiff may have been satisfied with giving up pure comparative fault in light of the fact that intentional acts are not within the definition of "fault" in Iowa Code section 668.1.

Given the posture of the case, I see no alternative other than to answer the question posed by the parties. I would simply hold that under Iowa Code chapter 668, the intentional misconduct of the plaintiff is not compared against the fault of the defendant. There may well be a different answer at common law, but that question is not presented in this appeal and cannot be decided now without reworking the tapestry of the trial in this case.

**IV. Conclusion.**

I would hold that under Iowa Code chapter 668, the intentional misconduct of the plaintiff cannot be compared against the fault of the defendant. I would therefore reverse the judgment of the district court.

Hecht, J., joins this dissent.